**OVERSEAS MOTORS, INC., a Michigan corporation, Plaintiff,**

v.

**IMPORT MOTORS LIMITED, INC., a Michigan corporation, et al., Defendants.**

**Civ. A. No. 38155.**

United States District Court, E. D. Michigan, S. D.

March 18, 1974.

---

■■■■■■■■■■

Wilfred L. Burke, Burke & Wilson, Detroit, Mich., for plaintiff.

George E. Bushnell, Jr., and Gregory L. Curtner, Miller, Canfield, Paddock & Stone, Detroit, Mich., for Volkswagenwerk Aktiengesellschaft and Volkswagen of America; Herbert Rubin, Herzfeld & Rubin, P. C., New York City, of counsel.

Bert Burgoyne, Travis Warren Hammond Ziegelman & Burgoyne, Detroit, Mich., for Audi NSU Auto Union; John A. Young, Graubard Moskovitz McGoldrick Dannett & Horowitz, New York City, of counsel.

Gordon J. Quist, Miller, Johnson, Snell & Cummiskey, Grand Rapids, Mich., for Import Motors.

## MEMORANDUM OPINION GRANTING MOTION FOR A DIRECTED VERDICT AND DENYING MOTION FOR RECONSIDERATION AND A NEW TRIAL

FEIKENS, District Judge.

This action is brought by Overseas Motors, Inc. (Overseas) against Audi NSU Auto Union Aktiengesellschaft (ANAU), Volkswagenwerk Aktiengesellschaft (VWAG), Volkswagen of America (VWOA), and Import Motors Limited, Inc. (Import). Plaintiff alleges violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (Count I); Section 7 of the Clayton Act, 15 U.S.C. § 18 (Count II); and Section 2 of the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1222 (Count III).

### Background

Overseas is a Michigan corporation. Prior to July of 1968 it operated a Detroit area dealership specializing in NSU trademarked automobiles. After that date its business expanded to include the importation and distribution of NSU cars in a ten (later eleven) state area.

ANAU, a German corporation, is the successor to NSU Motorenwerke Aktiengesellschaft (NSU), manufacturer of NSU automobiles, and Auto Union Gmbh (Auto Union), manufacturer of Audi automobiles. The two companies merged in 1969. Since that time ANAU has continued to produce both lines of cars.

VWAG is a German corporation engaged in the manufacture of Volkswagen automobiles. VWOA, a New Jersey corporation, is a wholly owned subsidiary of VWAG; its sole function is the importation and distribution of Volkswagen, Porsche and Audi cars in the United States.

Import, a Michigan corporation, distributes Volkswagen, Porsche and Audi cars in the midwestern United States. Although a part of the Volkswagen distribution network, it is independently owned and operated.

Between June 17 and July 1 of 1968 Overseas entered into an importer contract with NSU. It provided, *inter alia,* that plaintiff was to have the exclusive right to import and distribute NSU automobiles in a ten state area; that any extension of the contract was reserved; that plaintiff was to deal only in NSU products; that the contract might be terminated at the end of any calendar year after 1969 upon three months notice by any party; that the contract was to be governed by and interpreted in accordance with German law; and that disputes were to be submitted to a court of arbitration sitting in Zurich, Switzerland.

To obtain its automobiles Overseas was required to submit a "firm order" to NSU which was binding on Overseas but not on NSU. "Within the frame of the production available" NSU would respond with a "confirmed order" which was binding on both parties, subject apparently to Overseas providing an adequate letter of credit.

After entering into this agreement, Overseas began building and supplying a dealer network of modest proportions.

Then in March of 1969 NSU and Auto Union agreed to merge, the merger being completed in August of that year. Sometime between then and the summer of 1970 there began what plaintiff has referred to as a "pinching off" of its supply of automobiles. By the end of 1970 plaintiff was unable to obtain any cars from ANAU. Meanwhile, in December of 1969 Overseas had applied to Import for a retail Porsche-Audi franchise, but the application was never acted upon. In September of 1971, after the relationship between Overseas and ANAU had almost broken down, Overseas once again sought to obtain a Porsche-Audi franchise. This time Import approved the application and forwarded it to VWOA for final action which was never taken. Overseas eventually abandoned its efforts, secured a Fiat dealership, which it presently operates, and instituted this lawsuit.

### The Arbitration

Shortly after the commencement of this action ANAU gave notice to Overseas of its intent to submit Overseas' grievances to arbitration, as provided for in the contract. Overseas objected to any such proceedings and moved this court for a stay of arbitration on the ground that only antitrust issues, which the arbitrators would not be competent to pass on, were involved. This motion was denied, and on November 24, 1972, ANAU filed a complaint with the court of arbitration in Zurich asking it to declare that ANAU had not breached its contract with Overseas and to determine the date upon which the contract had been or would be terminated. Overseas refused to participate. The court of arbitration proceeded, and in its decision of May 24, 1973, made findings of fact and law and handed down a judgment in favor of ANAU. An English translation of the arbitrators' opinion was completed on June 14 and made available to all parties. Trial in this case commenced on July 5.

Upon completion of opening statements, and prior to the offer of any testimony, defendants interposed an objection *in limine* to the admission of any evidence inconsistent with the findings and decision of the court of arbitration, based on the doctrine of collateral estoppel. Defendants subsequently extracted the following list of findings and conclusions from the arbitration opinion, and requested the court to limit the proofs and permissible inferences therefrom in this case in accordance with those findings and to so instruct the jury.

1. Overseas and NSU entered into an Importer Contract on June 17/July 1, 1968.

2. That Contract contained a valid arbitration clause.

3. The Arbitration Court had valid jurisdiction.

4. The legal relationship of the parties is governed by the law of the Federal Republic of Germany.

5. The Importer Contract by itself does not constitute an order for the delivery of specific cars and parts, but forms a skeleton agreement for orders within its terms.

6. An order from Overseas was only accepted by NSU when it had been confirmed in writing.

7. Under Sec. 1 of the Contract NSU had an obligation to accept such orders only "within the scope of the available manufacture," and an order did not come into existence merely by the request for delivery by Overseas.

8. ANAU has performed its obligations under the Importer Contract.

9. Those orders which were confirmed and not carried out by NSU or ANAU were due to Overseas' failure to open letters of credit in due time.

10. From the beginning of February, 1971 no cars at all, but only spare parts, were ordered by Overseas and Overseas did not submit any estimates of annual

requirements for the years 1971 and 1972 although it was under an obligation to do so pursuant to Sec. 8 of the Importer Contract.

11. Overseas has no right to damages based on failure to deliver contractual goods [NSU cars].

12. The Importer Contract referred exclusively to distribution of NSU cars and parts.

13. After the merger between NSU and Auto Union the definition of the contractual articles was defined in the letter of November 4, 1969 signed by Overseas and ANAU specifically to the effect that by "NSU automobiles" there was to be understood the following models: "NSU 1000 C, NSU 1200 C, NSU TT."

14. The "Prinz 4 L" and "RO–80" models although part of the NSU product line were not mentioned in the letter since the prerequisites for export of these cars into the United States did not exist.

15. The former NSU company could not dispose of distribution rights in the U.S.A. for the Audi product line either before or after the merger.

16. The Auto Union company at the time of the merger was bound with respect to the U.S. market to VWoA and had entrusted to VWoA the distribution of Audi cars and parts for all 50 states.

17. After the merger, the contractual obligations of NSU passed to ANAU without any change in the nature of the obligations.

18. Overseas has no claim for damages for non-delivery of Audi products.

19. The sales figures of NSU within the territory of Overseas were low.

20. The sale of NSU cars was made difficult by the fact of decreasing demand for the NSU product line, by the fact that the cars had to be manufactured with special equipment due to the exhaust and safety regulations in the U. S. so that prices for these cars were rather high as compared with mass production, by the fact of the currency and economic policy measures taken by the governments of the Federal Republic of Germany and of the United States during the years 1969 and 1970 (export levy, revaluation of the German Mark, import restrictions in the U.S.) which served to reduce exports from Germany to the U.S.

21. ANAU endeavored to avoid any hardness with respect to Overseas.

22. ANAU voluntarily abandoned its right under Sec. 12(1) of the Importer Contract to cancel the contract as of December 31, 1971 and instead continued the Contract until it became clear that the prerequisites for further importation of NSU cars into the United States no longer existed.

23. By letter of April 15, 1971, ANAU gave notice to Overseas of cancellation of the Importer Contract; cancellation to take effect December 31, 1973.

24. There is no question that ANAU improperly exercised the right of cancellation.

25. By letter of September 9, 1969, ANAU advised Overseas that Overseas was permitted to sell competitive cars, which permission was repeated by letter of April 15, 1971.

26. Overseas' accusation that ANAU violated the principles of good faith and conscience as set forth in Sec. 242 of the German Civil Code is without grounds.

27. The refusal of Overseas to appoint an Arbitrator is not a violation of Sec. 12(2) of the Importer Contract.

28. The Importer Contract was not terminated as of October 31, 1972.

29. The Importer Contract is terminated effective December 31, 1973.

30. The Decision of the Arbitration Court declares:

 (a) "That defendant [Overseas] has no right to indemnification for direct or indirect damage due to acts (violation of obligations to deliver contract articles) or to omissions, and particularly omitted performances (failure to deliver AUDI products) or for violation of the principles of good faith and conscience in business transactions (preventing the defendant from selling cars of other automobile manufacturers, impeding the defendant in the sale of cars in cooperation with the Volkswagen AG and its subsidiary—the Volkswagen of America, Inc.—merger between the former NSU Motorenwerke AG and the former Auto Union GmbH) in connection with the Importer's Contract as of June 17/July 1, 1968.

 (b) "That the Importer's Contract of June 17/July 1, 1968, existing between the plaintiff [ANAU] and the defendant and supplemented by letter of November 4, 1969, terminates on December 31, 1973."

31. The Importer Contract refers "exclusively to the distribution of NSU cars and parts." This, by definition, excludes "Audi" products.

32. The former NSU Motorenwerke could not dispose of distribution rights in the USA for the Audi product line either before or after the merger. .

33. "No right of action on the part of the defendant [Overseas] for the receipt of Audi products can have arisen, so that claims for damages by defendant for non-delivery of these products cannot enter into consideration."

34. "[T]he defendant [Overseas] was assured exclusive rights in the sales territory exclusively with respect to NSU automobiles."

35. Plaintiff has no right to indemnification for direct or indirect damage due to acts, omissions or omitted performances· "failure to deliver Audi products."

### Collateral Estoppel

 Inherent in the concept of law as a mechanism for settling disputes is the requirement that properly rendered judgments must effectively bind the parties thereto.

"This general rule is demanded by the very object for which civil courts have been established, which is to secure the peace and repose of society by the settlement of matters capable of judicial determination. Its enforcement is essential to the maintenance of social order: for the aid of judicial tribunals would not be invoked for the vindication of rights of person and property, if, as between parties and their privies, conclusiveness did not attend the judgments of such tribunals in respect of all matters properly put in issue, and actually determined by them."[1]

This essential principle is formally recognized in the broad, judicially created doctrine of res judicata.[2]

---

1. Southern Pacific R.R. v. United States, 168 U.S. 1, 49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897).

2. Discussions of this subject have been plagued by inconsistent and confusing terminology. Usage in this opinion will generally follow the Restatement of Judgments and those cases [see, e. g., Commissioner v. Sunnen, 333 U.S. 591, 597–98, 68 S.Ct. 715, 92 L.Ed. 898 (1948)] employing "res judicata" as a generic term encompassing all facets of the finality of judgments. The Restatement divides this general principle into four cate-

**510**

■ One of the doctrine's two basic applications, to which use of the term res judicata is often restricted, prevents relitigation of any facet of a once tried cause of action. The other—the doctrine of collateral estoppel—prevents relitigation of particular issues which have been previously resolved as part of a different cause of action.[3]

"The general principle announced in numerous cases is that a right, question, or fact distinctly put in issue, and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies; and, even if the second suit is for a different cause of action, the right, question, or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified." [4]

■ There are five basic requirements for collateral estoppel: [5] (1)

gories—merger, bar, collateral estoppel and direct estoppel. Restatement of Judgments Ch. 3, Introductory Note at 160 (1942). The more common distinction (*see* note 3, *infra*) is merely between merger and bar on the one hand and collateral estoppel on the other. The term res judicata is often limited to the former [*see, e. g.*, 1B J.Moore, Federal Practice ¶ 0.405 at 622 (2d ed. 1965) (hereinafter cited as Moore); cases cited at note 3, *infra*], a point which must be kept in mind in reading opinions on the subject. This opinion deals specifically with collateral estoppel, which has also been referred to variously as estoppel by record, estoppel by findings, estoppel by judgment, and estoppel by verdict. *See* 1B Moore, *supra*, ¶ 0.441[2] at 3776; Polasky, Collateral Estoppel—Effects of Prior Litigation, 39 Iowa L. Rev. 217, at 217 (1954). Where it becomes necessary to distinguish this from other dimensions of res judicata, this court will join other courts and commentators [*see* Towle v. Boeing Airplane Co., 364 F.2d 590 (8th Cir. 1966); Michigan v. Morton Salt Co., 259 F.Supp. 35 (D.Minn.1966), aff'd sub nom., Hardy Salt Co. v. Illinois, 377 F.2d 768 (8th Cir. 1967), cert. denied, 389 U.S. 912, 88 S.Ct. 238, 19 L.Ed.2d 260 (1967); Semmel, Collateral Estoppel, Mutuality and Joinder of Parties, 68 Colum.L.Rev. 1457 (1968)] who have adopted the more accurately descriptive terminology developed by Professor Allan Vestal in a series of articles on the elements of res judicata. *See, e. g.*, Vestal, Preclusion/Res Judicata Variables: Parties, 50 Iowa L.Rev. 29 (1954); Preclusion/Res Judicata Variables: Nature of the Controversy, 1965 Wash.U.L.Q. 158; Res Judicata/Preclusion by Judgment: The Law Applied in the Federal Courts, 66 Mich.L.Rev. 1723 (1968). The general principle of res judicata is represented as preclusion by judgment, while its components are termed claim preclusion (res judicata in the narrow sense) and issue preclusion (collateral estoppel).

Although it is only the doctrine of collateral estoppel which is at issue here, materials dealing with other aspects of res judicata will often be cited in support of propositions common to both branches of preclusion by judgment. Where the relevant principles are identical, the cases have been cited interchangeably, without specific explanation.

3. "The basic distinction between the doctrines of *res judicata* and collateral estoppel, as those terms are used in this case, has frequently been emphasized. Thus, under the doctrine of *res judicata*, a judgment 'on the merits' in a prior suit involving the same parties or their privies bars a second suit based on the same cause of action. Under the doctrine of collateral estoppel, on the other hand, such a judgment precludes relitigation of issues actually litigated and determined in the prior suit, regardless of whether it was based on the same cause of action as the second suit." Lawlor v. National Screen Service Corp., 349 U.S. 322, 326, 75 S.Ct. 865, 867, 99 L.Ed. 1122 (1955) (footnote omitted).

The classic discussion of this "very old law" [Irving National Bank v. Law, 10 F.2d 721, 724 (2d Cir. 1926)] is Mr. Justice Field's opinion in Cromwell v. County of Sac, 94 U.S. 351, 24 L.Ed. 195 (1877).

4. Southern Pacific R.R. v. United States, 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897).

"Thus the principle of such an estoppel may be stated as follows: Where there is a second action between parties, or their privies, who are bound by a judgment rendered in a prior suit, but the second action involves a different claim, cause, or demand, the judgment in the first suit operates as a collateral estoppel as to, but only as to, those matters or points which were in issue or controverted and upon the determination of which the initial judgment necessarily depended." 1B Moore, *supra*, note 2, ¶ 0.441[2] at 3777 (footnotes omitted).

5. *See* Smith v. United States, 369 F.2d 49, 54 (8th Cir. 1966).

There must be a final[6] and valid[7] judgment affecting the same (or similarly situated) parties as appear in a second action;[8] (2) the issue to be concluded must be the same as that involved in the prior action;[9] (3) the issue must have been raised, considered, and actually adjudicated in the prior action;[10] (4) the issue must have been material and relevant to the disposition of the prior action;[11] and (5) the resolution of that issue must have been essential to the judgment rendered (*i. e.*, not dictum).[12]

The presence of several of these preconditions in this case is undisputed. The arbitration was properly commenced under the terms of the importer contract, and its outcome is determinative as to all contractual rights and liabilities.[13] That it was an arbitration rather than a judicial proceeding does not affect its authority as res judicata,[14] nor does the fact it was before a foreign rather than a domestic tribunal.[15] The findings of the arbitrators were relevant and material to the central issues of the arbitration and essential to their resolution. Although not all defendants were parties to the arbitration, the doctrine of mutuality of estoppel,[16] which would have precluded strangers to that judgment from taking advantage of it here, has been thoroughly discredited and largely discarded in the federal courts.[17]

---

6. G. & C. Merriam Co. v. Saalfield, 241 U.S. 22, 28, 36 S.Ct. 477, 60 L.Ed. 868 (1916); McDonnel v. United States, 455 F.2d 91, 96 (8th Cir. 1972); Premier Electrical Construction Co. v. Miller-Davis Co., 422 F.2d 1132, 1138–39 (7th Cir. 1970).

7. The inquiry into validity of the prior judgment is, however, of limited scope. *See, e. g.*, United States ex rel. Konigsberg v. McFarland, 348 F.2d 215 (3d Cir. 1965); Lavasek v. White, 339 F.2d 861 (10th Cir. 1965) (jurisdiction over parties and subject matter); Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940) (constitutional infirmity); Hovey v. Elliott, 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215 (1897); Berry v. Allen, 411 F.2d 1142 (6th Cir. 1969) (decree outside scope of the court's authority); Rheinberger v. Security Life Ins. Co., 146 F.2d 680 (7th Cir. 1944) (mode of procedure and scope of decree). If a judgment is possessed of these fundamental requisites, it is res judicata even though erroneous. *See, e. g.*, Smith v. Alleghany Corp., 394 F.2d 381 (2d Cir. 1968), cert. denied, 393 U.S. 939, 89 S.Ct. 300, 21 L.Ed.2d 276; Thomas v. Consolidation Coal Co., 380 F.2d 69 (4th Cir. 1967), cert denied, 389 U.S. 1004, 88 S.Ct. 562, 19 L.Ed.2d 599.

8. *See* notes 16 and 17, *infra*.

9. Peterson v. Clark Leasing Corp., 451 F.2d 1291, 1292 (9th Cir. 1971); Embry v. Equitable Life Assurance Soc'y, 451 F.2d 472, 477 (10th Cir. 1971).

10. Mercoid Corp. v. Mid-continent Investment Co., 320 U.S. 661, 671, 64 S.Ct. 268, 88 L.Ed. 376 (1944); United Shoe Machinery Corp. v. United States, 258 U.S. 451, 459, 42 S.Ct. 363, 66 L.Ed. 708 (1922); Cromwell v. County of Sac, 94 U.S. 351, 352, 24 L.Ed. 195 (1877).

11. Norton v. Larney, 266 U.S. 511, 517, 45 S.Ct. 145, 69 L.Ed. 413 (1925).

12. Eastern Foundation Co. v. Creswell, 154 U.S.App.D.C. 240, 475 F.2d 351, 354–55 (1973); Louis Ender, Inc. v. General Foods Corp., 467 F.2d 327, 330–31 (2d Cir. 1972).

13. This was explicitly recognized in this court's memorandum opinion and order of October 17, 1972, refusing to stay the arbitration. *See also* 9 U.S.C. §§ 2, 201–207 (1970, Supp.1973); The Breman v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972).

14. *See, e. g.*, Bower v. Eastern Airlines, 214 F.2d 623, 625 (3d Cir. 1954); Goldstein v. Doft, 236 F.Supp. 730 (S.D.N.Y.1964), aff'd 2 Cir., 353 F.2d 484, cert. denied, 383 U.S. 960, 86 S.Ct. 1226, 16 L.Ed.2d 302. *Cf.* United States v. Utah Constr. & Mining Co., 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966).

15. *See* note 13, *supra*.

16. "The doctrine of mutuality requires that, as a general proposition, one who invokes the conclusive effect of a judgment must have been either a party or his privy to the suit in which the judgment was rendered. Stated differently, the mutuality requirement prevents a litigant from invoking the conclusive effect of a judgment unless he would have been bound if the judgment had gone the other way." 1B Moore, *supra* note 2, ¶ 0.412 at 1801. This is to be distinguished from the doctrine of privity, which imposes essentially the same requirement in order for a party to be *bound* by a prior judgment. *See id.*, ¶ 0.411.

17. In Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971),

Consequently, all defendants may properly benefit from any estoppel arising out of the arbitration.

There are other conditions, however, which plaintiff argues have not been met. It asserts that: (1) defendants waived the affirmative defense of an arbitration award or estoppel by failing to raise it in the pleadings; (2) the decision of the court of arbitration was in the nature of a default judgment, and the issues resolved by that panel were therefore not "fully litigated" as is required for estoppel; (3) in view of plaintiff's appeal from the decision of this court refusing to stay the arbitration, the award is not final; and (4) the matters considered by the arbitrators involved exclusively antitrust issues which the arbitration court was incompetent to adjudicate.

■ *Waiver*—Rule 8(c) of the Federal Rules of Civil Procedure requires affirmative defenses, including arbitration and award, estoppel, and res judicata, to be pleaded as such.[18] Failure to plead an affirmative defense is generally held to constitute a waiver of that defense, at least to the · extent that its proponent may not introduce evidence in support thereof.[19] The apparent harshness of this rule is considerably mitigated, however, by several judicially recognized exceptions.[20] An affirmative defense is not waived, even though not specifically pleaded, where it is based upon the opposing party's own proofs or pleadings,[21] where there was no opportunity to raise it in the pleadings,[22] or where it is tried

the Supreme Court discussed at length the pronounced trend toward abandonment of the mutuality requirement in both state and federal courts. *See also* Rachal v. Hill, 435 F.2d 59 (5th Cir. 1970), cert. denied, 403 U.S. 904, 91 S.Ct. 2203, 29 L.Ed.2d 680; Bruszewski v. United States, 181 F.2d 419 (3d Cir. 1950), cert. denied, 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632; Zdanok v. Glidden Co., 327 F.2d 944 (2d Cir. 1964), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298; Bernhard v. Bank of America, 19 Cal. 2d 807, 122 P.2d 892 (1942); Israel v. Wood Dolson Co., 1 N.Y.2d 116, 151 N.Y.S. 2d 1, 134 N.E.2d 97 (1956); Semmel, Collateral Estoppel, Mutuality and Joinder of Parties, 68 Colum.L.Rev. 1457 (1968); Note, Collateral Estoppel: The Demise of Mutuality, 52 Cornell L.Q. 724 (1967). *See generally* Annot., 31 A.L.R.3d 1044 (1970). Although finding · a "wholesale approval or rejection" of this trend to be unnecessary, the Court did conclude that "the uncritical acceptance of the principle of mutuality of estoppel expressed in Triplett v. Lowell [297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949 (1936)] is today out of place. Thus, we conclude that *Triplett* should be overruled to the extent it forecloses a plea of estoppel by one facing a charge of infringement of a patent that has once been declared invalid." 402 U.S. at 350, 91 S.Ct. at 1453. The tenor of this unanimous opinion and the logic of the Court's decision, however, seem clearly to extend as well to non-patent cases. *See* P I Enterprises, Inc. v. Cataldo, 457 F.2d 1012 (1st Cir. 1972). *But see* Grantham v. McGraw Edison Co., 444 F.2d 210 (7th Cir. 1971).

18. "In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense. When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation." Fed.R.Civ.P. 8(c).

19. RCA v. Radio Station KYFM, Inc., 424 F.2d 14, 17 (10th Cir. 1970); Albee Homes, Inc. v. Lutman, 406 F.2d 11, 13 (3d Cir. 1969).

20. *See* 5 C. Wright and A. Miller, Federal Practice and Procedure: Civil § 1278, at 344 (1969) (hereinafter cited as Wright & Miller). *See generally* Annot., 120 A.L.R. 8, 55–99, 126–66 (1939).

21. *See* Federal Savings and Loan Ins. Corp. v. Hogan, 476 F.2d 1182, 1186 (7th Cir. 1973); Bradford Audio Corp. v. Pious, 392 F.2d 67, 73 (2d Cir. 1968); Iacaponi v. New Amsterdam Casualty Co., 379 F.2d 311, 312 (3d Cir. 1967); Black v. York, 300 Ky. 166, 168, 189 S.W.2d 599 (1945).

22. This may result from restrictions upon pleadings or from the fact that the prior judgment was not entered or did not become known to the defendant until after the pleadings were filed. *See* Richardson v. City

by express or implied consent of the opposing party.[23] The majority of cases also hold that affirmative defenses may properly be raised by motion to dismiss [24] or for summary judgment,[25] and that absent prejudice, leave to amend the pleadings to include an affirmative defense should be freely granted.[26]

■ Although defendants argue that Rule 8(c) is inapplicable here because the estoppel is raised as a rule of evidence rather than an affirmative defense, that argument is not persuasive. This case is unusual in that the issues sought to be foreclosed are evidentiary or mediate rather than ultimate; plaintiff would be restricted in its proofs, but the restrictions would not be dispositive as a matter of law of any of the ultimate questions (antitrust issues) in this case.[27] In this sense the estoppel principles involved do resemble rules of evidence. There is, however, a crucial difference. A rule of evidence is essentially procedural; it limits the mode of proof, not its objective. An affirmative defense is substantive, and restricts what may be proved (by any means) rather than prescribing how points properly in issue may be proved. Collateral estoppel, because it operates as a limitation on the issues in a case, not on the types of evidence which may be introduced in support of those issues, is a substantive defense. Being extrinsic to the plaintiff's prima facie case it is affirmative in nature, and therefore falls within the ambit of Rule 8(c).[28] Nevertheless, there are good reasons for rejecting plaintiff's argument.

■ First, the substance of the defense was in fact pleaded in paragraph 19 of ANAU's answer, raising the arbitration as a jurisdictional bar.[29] Of course the defense of res judicata had not matured at the time the answer was filed,[30] and it was not possible for all of its essential elements to be pleaded with specificity, nor was there even an explicit reference to its future application. But at the very least plaintiff was ap-

of Boston, 60 U.S. (19 How.) 263, 267, 15 L.Ed. 639 (1857) ; Montgomery Ward & Co. v. Robert Cagle Bldg. Co., 265 F.Supp. 469, 471–472 (S.D.Texas 1967) ; Annot., 120 A. L.R. 8, 78–83 (1939).

23. This normally takes the form of plaintiff's failure to object to introduction of evidence by the defendant in support of the unpleaded affirmative defense. *See* Fed.R.Civ.P. 15 (b) ; Wright & Miller, *supra* note 20, § 1278 at 345–46 ; Joyce v. L.P. Steuart, Inc., 97 U.S.App.D.C. 33, 227 F.2d 407, 408–09 (D.C.Cir. 1955) ; Kaye v. Smitherman, 225 F.2d 583, 593–94 (10th Cir. 1955), cert. denied, 350 U.S. 913, 76 S.Ct. 197, 100 L.Ed. 800 ; Tillman v. National City Bank, 118 F. 2d 631, 635 (2d Cir. 1941), cert. denied, 314 U.S. 650, 62 S.Ct. 96, 86 L.Ed. 521.

24. *See, e. g.,* Thomas v. Consolidation Coal Co., 380 F.2d 69 (4th Cir. 1967) ; Williams v. Murdoch, 330 F.2d 745 (3d Cir. 1964) ; Suckow Borax Mines Consol. v. Borax Consol., Ltd., 185 F.2d 196 (9th Cir. 1950) ; Connelly Foundation v. School Dist. of Haverford Township, 326 F.Supp. 241 (E.D.Pa. 1971), aff'd 461 F.2d 495 (3d Cir. 1972).

25. Harrison v. Thompson, 447 F.2d 459 (5th Cir. 1971) ; Miller v. Shell Oil Co., 345 F.2d 891 (10th Cir. 1965) ; Fletcher v. Nostadt, 205 F.2d 896 (4th Cir. 1953), cert. denied, 346 U.S. 877, 74 S.Ct. 126, 98 L.Ed. 385.

*See also* Annot., 95 A.L.R.2d 648, §§ 2–3 (1964). *See generally* 2A Moore, *supra* note 2, ¶ 8.28 ; 5 Wright & Miller, *supra* note 20, § 1277 (raising affirmative defenses by motions to dismiss or for summary judgment).

26. Fed.R.Civ.P. 15(a), (b) ; Deakyne v. Commissioners of Lewes, 416 F.2d 290, 298–99 (3d Cir. 1969) ; Albee Homes, Inc. v. Lutman, 406 F.2d 11, 13–14 (3d Cir. 1969) ; McNaughton v. New York Central R.R., 220 F.2d 835, 840 (7th Cir. 1955).

27. *See* notes 77–80 and accompanying text, *infra.*

28. *See, e. g.,* Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 350, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971) ; Hatridge v. Aetna Casualty & Surety Co., 415 F.2d 809, 813 (8th Cir. 1969).

29. "This Court lacks jurisdiction over the subject matter of this dispute, the parties having agreed in writing to arbitrate all disputes arising out of or connected with the contract between them and such an arbitration being currently pending."

30. The answer was filed on June 16, 1972. The arbitration award was not handed down until May 24, 1973. There is no res judicata until the rendition of a final judgment. *See* note 6, *supra.*

prised of ANAU's intent to proceed with the arbitration and to assert it in some manner as a limitation on this lawsuit. Under the liberal system of notice pleading established by the Federal Rules of Civil Procedure [31] such an averment adequately informs the opposing party of the existence of the defense, thereby fulfilling the requirement of Rule 8(c).

Alternatively, even if this original pleading were insufficient to raise collateral estoppel as an affirmative defense, that issue has entered the case in other ways which fall within the exceptions to Rule 8(c). Although plaintiff did not mention the arbitration in its pleadings, it did interject it as an issue in this case in a very substantial way by its motion to stay the arbitration proceedings. The effect was no different than if it had appeared on the face of the complaint, and plaintiff cannot now exclude from the case a matter it has itself put in issue.[32] Plaintiff also failed to make a timely objection to the introduction of evidence at trial in support of defendants' claim of estoppel.[34] Having once permitted evidence of an affirmative defense into the case without objection, plaintiff has expressly or impliedly consented to trial of that issue and cannot reverse that decision and object at a later date to its non-pleading.[35] Finally, because the arbitration court's decision was handed down well after the answers in this case were filed, there was no prior judgment which could have been pleaded as res judicata in those answers. This lack of opportunity excuses any failure to plead the affirmative defense prior to the time it arose.[36] Once the defense became available, defendants were required to raise it within a reasonable time. This they did by an appropriate motion at the opening of trial.[37]

31. "[A]ll the Rules require is 'a short and plain statement of the claim' [Fed.R.Civ.P. 8(a)(2)] that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). Rule 8(f) specifically commands that "[a]ll pleadings shall be so construed as to do substantial justice", and this exhaltation of substance over form has been continually espoused and faithfully practiced by the federal courts. See Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966); Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); Conley v. Gibson, supra; Maty v. Grasseli Chemical Co., 303 U.S. 197, 58 S.Ct. 507, 82 L.Ed. 745 (1938). See generally 2, 2A Moore, supra note 2, ¶¶ 1.13[1], 8.34.

32. See note 39 and accompanying text, infra.

33. Cf. Federal Savings and Loan Ins. Corp. v. Hogan, 476 F.2d 1182, 1187 (7th Cir. 1973); Bradford Audio Corp. v. Pious, 392 F.2d 67, 73 (2d Cir. 1968).

34. Copies of the arbitrators' decision were first introduced into evidence on a special record made in the absence of the jury on July 9 (tr. 66), and the contemporaneous discussions between court and counsel indicates a willingness on the part of plaintiff to address the issue of collateral estoppel on the merits (tr. 57–88). It was not until July 18 that plaintiff objected to the defense not having been pleaded (tr. 617–23).

35. See note 23, supra.

36. See note 22, supra.

37. The defense of res judicata is properly raised on motion where unavailable at the time the pleadings were filed. Hart Steel Co. v. Railroad Supply Co., 244 U.S. 294, 37 S.Ct. 506, 61 L.Ed. 1148 (1917); Williamson v. Columbia Gas. & Elec. Corp., 186 F.2d 464 (3d Cir. 1950); Bennett v. Commissioner, 113 F.2d 837 (5th Cir. 1940); Nachod & United States Signal Co. v. Helvering, 74 F.2d 164 (6th Cir. 1934). The usual form is a motion to dismiss or for summary judgment (see notes 24 and 25, supra). Although initially styled as a motion to dismiss (tr. 58), the instant motion in fact sought only the exclusion of certain evidence (tr. 58–59, passim). Normally an affirmative defense cannot be raised at trial merely by objection to evidence. See RCA v. Radio Station KYFM, Inc., 424 F.2d 14, 17 (10th Cir. 1970). Here, however, the estoppel was not dispositive as to the ultimate issues involved (see pages 518–524, infra), and could not alone give rise to cause for dismissal or summary judgment. The defendants were entitled to raise the substance of the estoppel defense, and "where the substantive rights of the parties are not endangered, the manner of raising the defense is unimportant." Bloomfield Avenue

In support of these conclusions it must be noted that the plaintiff's position on this issue is one of sheer technicality. "The purpose of [requiring res judicata and collateral estoppel to be pleaded as affirmative defenses] is to give the opposing party notice of the plea of estoppel and a chance to argue, if he can, why the imposition of an estoppel would be inappropriate." [38] That purpose has unquestionably been fulfilled in this case. Plaintiff all along the way has been well aware of the arbitration and its potential significance. It has had ample time and full opportunity to prepare, brief, and argue its position on the merits, and has done so not only fully but interminably. Plaintiff cannot demonstrate one scintilla of prejudice it has suffered as a result of defendants' failure to frame a pleading under the rubric of res judicata/collateral estoppel. In these circumstances amendment of defendants' pleadings to expressly set forth such a defense would readily be permitted at any point during the trial or even thereafter; [39] to refuse such a request might constitute an abuse of discretion.[40] To hold that the defense has been waived merely because no request to amend was ever made would represent an equally intolerable miscarriage of justice.[41]

"Pleadings are intended to serve as a means of arriving at fair and just settlements of controversies between litigants. They should not raise barriers which prevent the achievement of that end. . . . Proper pleading is important, but its importance consists in its effectiveness as a means to accomplish the end of a just judgment." [42] "The ends of justice are not served when forfeiture of just claims because of technical rules is allowed." [43]

Corp. v. Montclair Mfg. Co., 90 F.Supp. 1020, 1021 (D.N.J.1950); United States v. Alaska, 197 F.Supp. 834, 836 (D.Alaska 1961). Where the usual motions are inappropriate vehicles for raising the defense in a particular case, an objection to the admission of evidence may be the only available means of presenting a previously unavailable affirmative defense. See Bishop v. Dodge, 196 Mich. 231, 239, 162 N.W. 1002, 1005 (1917), *quoting from* 8 R.C.L. at 842:

"[E]stoppel by record or otherwise should as a general rule be pleaded where the case gives opportunity, 'or, if from the nature of the case it cannot properly be pleaded, but goes rather to the admissibility of evidence, it should be made the basis of an objection to such evidence . . . .'"

There are even cases holding that the defense may be raised by the court on its own motion. W. E. Hedger Transp. Corp. v. Ira S. Bushey & Sons, 186 F.2d 236 (2d Cir. 1951); Wilson v. United States, 166 F.2d 527 (8th Cir. 1948).

38. Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 350, 91 S.Ct. 1434, 1453, 28 L.Ed.2d 788 (1971). "Affirmative defenses are required to be pleaded to prevent surprise." Huszar v. Cincinnati Chemical Works, Inc., 172 F.2d 6, 9 (6th Cir. 1949).

39. Fed.R.Civ.P. 15(a), (b). *See, e. g.,* United States ex rel. D'Agostino Excavators, Inc. v. Heyward-Robinson Co., 430 F.2d 1077, 1086–87 (2d Cir. 1970); Browne v. R &

R Eng'r Co., 164 F.Supp. 315, 317 (D.Del. 1958); Plassey v. Kavanagh, 132 F.Supp. 1, 3 (E.D.Mich.1955); Von Wedel v. McGrath, 100 F.Supp. 434 (D.N.J.1950), aff'd 194 F. 2d 1013 (3d Cir. 1952). *See also* Bryan v. Austin, 354 U.S. 933, 77 S.Ct. 1396, 1 L.Ed.2d 1527 (1957); Emich Motors Corp. v. General Motors Corp., 229 F.2d 714 (7th Cir. 1956).

40. Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L.Ed.2d 222 (1962); Deakyne v. Commissioners of Lewes, 416 F.2d 290, 298–300 (3d Cir. 1969); Newman v. Zinn, 164 F.2d 558, 559–560 (3d Cir. 1947).

41. "While plaintiffs could raise the issue by filing supplemental complaints alleging the same things as are set forth in their motions, it would be an empty and useless tribute to technicality to require them to do so, or penalize them for not doing so, and it would be contrary to the imprimatur of the Federal Rules of Civil Procedure, Rule 1, that such rules 'shall be construed to secure the just, speedy, and inexpensive determination of every action.'" United States v. United Air Lines, Inc., 216 F.Supp. 709, 718 (E.D.Wash., D.Nev.1962).

42. Maty v. Grasselli Chemical Co., 303 U.S. 197, 200–201, 58 S.Ct. 507, 509, 82 L.Ed. 745 (1938).

43. Travelers Indemnity Co. v. United States, 382 F.2d 103, 106 (10th Cir. 1967).

■■■ *Default Judgment*—Collateral estoppel applies only to those issues which were "actually" or "fully litigated" in the prior action.[44] However, this rule does not refer to the quality or quantity of argument or evidence addressed to an issue. It requires only two things: first, that the issue has been effectively raised in the prior action,[45] either in the pleadings[46] or through development of the evidence and argument at trial or on motion;[47] and second, that the losing party has had "a fair opportunity procedurally, substantively, and evidentially"[48] to contest the issue.[49] The general rule therefore is that subject to these restrictions default judgments do constitute res judicata for purposes of both claim preclusion[50] and issue preclusion (collateral estoppel).[51]

The restatement position is contrary —that a default judgment may not be used as a basis for collateral estoppel[52] —and has some limited support in the cases[53] and commentary.[54] To the extent this reluctance is founded (as it

44. *See, e. g.*, United Shoe Machinery Corp. v. United States, 258 U.S. 451, 459, 42 S.Ct. 363, 66 L.Ed. 708 (1922); James Talcott, Inc. v. Allahabad Bank, Ltd., 444 F.2d 451, 458 (5th Cir. 1971); Granader v. Public Bank, 417 F.2d 75, 82 (6th Cir. 1969), cert. denied, 397 U.S. 1065, 90 S.Ct. 1503, 25 L. Ed.2d 686 (1969).

45. "In order to have been litigated, the issue to be concluded must have been raised between the parties in the prior action." 1B Moore, *supra* note 2, ¶ 0.443[3] at 3909.

46. James Talcott, Inc. v. Allabahad Bank, Ltd., 444 F.2d 451, 459–460 (5th Cir. 1971); Paine & Williams Co. v. Baldwin Rubber Co., 113 F.2d 840, 843 (6th Cir. 1940).

47. Hardy v. Bankers Life & Cas. Co., 232 F.2d 205, 209 (7th Cir. 1956); Paine & Williams Co. v. Baldwin Rubber Co., 113 F. 2d 840, 843 (6th Cir. 1940).

48. Eisel v. Columbia Packing Co., 181 F. Supp. 298, 301 (D.Mass.1960), *quoted in* Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 333, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

49. This requirement is normally identified as the successor to the older standards of mutuality. *See* notes 16 and 17, *supra*. It also speaks, however, to one of the two troublesome aspects involved in giving preclusive effect to default judgments. The first of these concerns whether the issue was effectively brought to the court's attention and is covered by the first part of this rule. *See* notes 45–47, *supra*. The second is the lack of participation by one party in the proceedings and a consequent absence of the adversary method of truth-finding. Here, much as with mutuality, there are reasons of equity and social policy for considering fair opportunity an adequate substitute for actual participation. These reasons are essentially the same as those permitting binding default judgments to be entered in the first place, and they boil down to a single, essential proposition: a party cannot be permitted to avoid the law merely by avoiding the courts.

This willingness to forego the comfortable assurances of accuracy generated by a full dress trial is justified by the defaulting party's willful failure to make an adversary input into the prior proceedings. The law cannot force a party to make the best case possible or even any case at all; it only permits him to do so, prompted by his own self-interest. The only logical alternative would be to accept a prior judgment as binding only if both sides had supported their positions at some minimal level of competence, for mere appearance is hardly a guarantee of effective advocacy. Such searching and highly subjective reviews of prior performances by counsel are probably impossible and certainly unacceptable even if possible. "If an issue is raised and the party who has the burden fails in his proof and the issue is decided against him, he is just as much bound by collateral estoppel as though he had presented a barrel of testimony." United States v. Silliman, 167 F.2d 607, 617 (3d Cir. 1948), cert. denied, 335 U. S. 825, 69 S.Ct. 48, 93 L.Ed. 379. The party who defaults ought therefore to be given no greater protection from preclusion than one who simply fails in his proof. In both instances he is entitled to a full and fair opportunity to litigate, and having received that, ought then to be precluded from rearguing the issues decided in his absence, whether the absence was formal or merely effective.

50. *See, e. g.*, Morris v. Jones, 329 U.S. 545, 550–552, 67 S.Ct. 451, 91 L.Ed. 488 (1947). *See generally* Annot., 77 A.L.R.2d 1410 (1961).

51. Last Chance Mining Co. v. Tyler Mining Co., 157 U.S. 683, 691, 15 S.Ct. 733, 39 L. Ed. 859 (1895); Woods v. Cannaday, 81 U. S.App.D.C. 281, 158 F.2d 184, 185 (D.C.Cir. 1946); Lane v. Hartford Fire Ins. Co., 343 F.Supp. 79, 85 (E.D.Mo.1972).

52. Restatement of Judgments § 68(f), at 302–04 (1942).

53. *See, e. g.*, Blanchard v. Stribling, 157 Fla. 10, 24 So.2d 713 (1946).

54. *See* 1B Moore, *supra* note 2, ¶ 444[2] at 4006.

seems to be) upon the possible injustice of compelling a defendant to engage in expensive and time-consuming litigation over relatively trivial matters, at the risk of being forever bound by the plaintiff's allegations if he does not, a blanket refusal to recognize collateral estoppel in default cases is far too heavy-handed and indiscriminate a remedy. The two-part test referred to above is far more functional. It not only protects against the abuses of unforeseeability, by including such factors as incentive to litigate and choice of forum in the calculus of full and fair opportunity,[55] it is also more sensitive to those instances in which the legitimate functions of an estoppel and the absence of abuse compel a different result.

■ The decision of the Zurich court of arbitration meets both preconditions for the use of a default judgment as collateral estoppel. It appears from an examination of the complaint and the arbitrators' opinion that the findings made therein do relate to matters raised in the complaint. They were formally put in issue and properly before the tribunal; decision on them was within the scope of that proceeding as defined by the complaint. Plaintiff also had a "full and fair opportunity to argue [its] version of the facts"[56] before the court of arbitration. The possible inconvenience of litigating in that forum is outweighed by its voluntarily assumed contractual obligation to do so in the event of a dispute. Although plaintiff has consistently denied any intention to pursue its contractual remedies for ANAU's alleged breach, and thus might ordinarily have had little incentive to contest ANAU's claim of no liability under the contract, it is undenied that the arbitration was a proper proceeding for the determination of contractual rights and liabilities. To the extent that plaintiff has itself raised these same issues in this case it cannot argue that the possibility of estoppel by prior decision was unforeseen. This is simply not a case where a party defaults because it has little interest in the outcome of the first suit, and is then surprised by the later application of its result to a matter of much greater moment.

■ *Finality*—"[I]t is familiar law that only a final judgment is *res judicata*",[57] but finality for these purposes, much like finality for purposes of appeal under 28 U.S.C. § 1291,[58] is not the equivalent of immutability. The judgment need only make a currently effective disposition of the issues raised; the possibility of future impairment in separate proceedings generally does not diminish its effectiveness as res judicata.[59] This is true in most states[60] and in the federal courts[61] during the pendency of an appeal, unless the appeal will involve a trial de novo.[62]

The arbitration award was not directly appealed nor has its operation been in any way impaired. The appeal from this court's refusal to stay the arbitra-

55. *Cf.* Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 333, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

56. United States v. Utah Constr. & Mining Co., 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966).

57. G. & C. Merriam Co. v. Saalfield, 241 U.S. 22, 28, 36 S.Ct. 477, 480, 60 L.Ed. 868 (1916). *See* Restatement of Judgments § 68(1) (1942).

58. These standards are closely related (*see* 1B Moore, *supra* note 2, ¶ 0.416[3]) and are often used interchangeably. *See, e. g.,* Washington Bldg. Services, Inc. v. United Janitorial Services, Inc., 122 U.S.App.D.C. 202, 352 F.2d 678, 682 (D.C.Cir. 1965).

59. Indeed, a decision which is based on the res judicata effect of a previous decision will stand until directly attacked, even though the case relied on is later overruled. Reed v. Allen, 286 U.S. 191, 52 S.Ct. 532, 76 L.Ed. 1054 (1932).

60. *See* 1B Moore, *supra* note 2, ¶ 0.416 [3] at 2254 n. 26.

61. Huron Holding Corp. v. Lincoln Mine Operating Co., 312 U.S. 183, 189, 61 S.Ct. 513, 85 L.Ed. 725 (1941).

62. Refior v. Lansing Drop Forge Co., 134 F.2d 894, 896 (6th Cir. 1943).

tion can at best have no greater effect than would a direct appeal of the award itself. The fact that it will not be determined until after a decision is entered in this case [63] merely emphasizes the necessity of proceeding on the record as it presently exists.

 *Antitrust and Contract Issues*—Claims arising under the antitrust laws are within the exclusive jurisdiction of the federal courts.[64] They are not subject to arbitration and no res judicata *qua* claim preclusion could be based on any such proceeding.[65] As this court has previously determined, the questions submitted to the Zurich court of arbitration were not in the nature of antitrust claims. That cause of action was bottomed on contract, and in the absence of allegations that the contract itself was intrinsically violative of the antitrust laws, such actions are not preempted by this court's exclusive authority over them.[66] Conversely, an adverse judgment in that case is no bar to maintenance of antitrust claims arising out of the same transactions.

The far more difficult question now before the court is the extent to which issue preclusion through collateral estoppel must also be limited in antitrust suits in order to preserve a viable policy of pre-emption. It is one thing to conclude that because the arbitration was based on a different cause of action and performed a distinct and legitimate function it was a proper proceeding, which could not be stayed and which resulted in a valid, binding judgment. It is quite another to conclude that the arbitrators' decision must be given collateral as well as direct effect so as to predetermine in some measure the result of this separate antitrust suit.

This suit and the arbitration are based almost entirely upon the same series of events. In lesser measure they also involve identical questions as to the jural significance of those facts. Thus, as between these two actions, many of the preliminary determinations of fact and law upon which a judgment must ultimately be based concern identical issues.[66a]

**63.** On November 6, 1973, the Sixth Circuit Court of Appeals ordered plaintiff's appeal from this court's order refusing to stay the arbitration consolidated with the appeal of the case in chief, thus deferring any ruling until after this decision has been finally entered. Overseas Motors, Inc. v. Import Motors Limited, Inc., No. 72–2198 (6th Cir., appeal filed Nov. 7, 1972).

**64.** *See* General Investment Co. v. Lake Shore & Mich. So. Ry., 260 U.S. 261, 287, 43 S.Ct. 106, 67 L.Ed. 244 (1922); Blumenstock Bros. Advertising Agency v. Curtis Publishing Co., 252 U.S. 436, 441, 40 S.Ct. 385, 64 L.Ed. 649 (1920); Washington v. American League of Professional Baseball Clubs, 460 F.2d 654, 658 (9th Cir. 1972); Cream Top Creamery v. Dean Milk Co., 383 F.2d 358, 363 (6th Cir. 1967).

**65.** *See, e. g.,* Helfenbein v. International Industries, Inc., 438 F.2d 1068, 1070 (8th Cir. 1971); American Safety Equipment Corp. v. J. P. Maguire & Co., 391 F.2d 821, 827–828 (2d Cir. 1968); Annot., 3 A.L.R.Fed. 918, § 3 (1970).

**66.** Associated Milk Dealers, Inc. v. Milk Drivers Union, Local 753, 422 F.2d 546, 552 (7th Cir. 1970); Loevinger, Antitrust Issues

as Subjects of Arbitration, 44 N.Y.U.L.Rev. 1085, 1094 (1969). *See also* Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959); Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L. Ed. 1219 (1947); American Mfrs. Mut. Ins. Co. v. American Broadcasting—Paramount Theatres, Inc., 17 N.Y.2d 849, 271 N.Y.S.2d 284, 218 N.E.2d 324, cert. denied, 385 U.S. 931, 87 S.Ct. 291, 17 L.Ed.2d 213 (1966).

**66a.** "An issue is a single, certain and material point arising out of the allegations and contentions of the parties." Paine & Williams Co. v. Baldwin Rubber Co., 113 F.2d 840, 843 (6th Cir. 1940). It may concern only the existence or non-existence of certain facts, or it may concern the legal significance of those facts. *See* United States Fidelity & Guaranty Co. v. McCarthy, 33 F.2d 7, 11 (8th Cir. 1929), cert. denied, 280 U.S. 590, 50 S.Ct. 38, 74 L.Ed. 639 (1929). If the issues are "merely evidentiary", they need only deal with the same past events to be considered identical. However, if they concern the legal significance of those facts, the legal standards to be applied must also be identical; different legal standards as applied to the same set of facts create different issues. Security Ins. Co. v. Johnson,

■ Identity of issues is absolutely essential for the invocation of collateral estoppel. If particular issues in the two suits differ in any significant way, a prior determination of one is simply irrelevant to a later determination of the other. Yet the greater the range and significance of identical issues in the two cases, the more conclusive will be the estoppel effects of the arbitration, the greater will be their infringement on this court's exclusive jurisdiction, and the stronger will be the reasons for refusing to give effect to them.

It is this foreclosure factor which demands some restriction upon the application of collateral estoppel in antitrust cases. Determining exactly how much requires some means of comparing the degree of foreclosure involved in preclusion of various kinds of issues, an inquiry in which the judicially developed distinction between evidentiary, mediate and ultimate issues or data[67] is helpful. The classic version is Judge Learned Hand's definition in The Evergreens v. Nunan:[68]

"It is of course well-settled law that a fact, once decided in an earlier suit, is conclusively established between the parties in any later suit, provided it was necessary to the result in the first suit. . . . However, a 'fact' may be of two kinds. It may be one of those facts, upon whose combined occurrence the law raises the duty, or the right, in question; or it may be a fact, from whose existence may be rationally inferred the existence of one of the facts upon whose combined occurrence the law raises the duty, or the right. The first kind of fact we shall for convenience call an 'ultimate' fact; the second, a 'mediate datum.' 'Ultimate' facts are those which the law makes the occasion for imposing its sanctions." [69]

Those facts which Judge Hand termed "mediate" may be further divided into those consisting of raw sensory data existing wholly independent of any legal standards (evidentiary facts), and those which represent applications of law to fact, but unlike ultimate facts, do not conclusively establish a legal right or liability under the law applicable to that case (mediate data).

For example, in the instant case a finding of the existence or non-existence of a conspiracy in restraint of trade would be an ultimate fact. Because plaintiff claims that a restraint of trade was accomplished through a breach of the importer contract, a finding of the existence or non-existence of such a breach would be a mediate datum. It is a conclusion based on law applied to fact, but because the antitrust laws do not make breach of contract the occasion for imposition of sanctions, it is not an ultimate issue in this action. In the arbitration, however, such a finding would represent an ultimate fact. Finally, a finding that ANAU shipped Overseas $x$ number of cars in 1969 is intrinsically non-legal and would therefore be evidentiary.

Viewed from this perspective, there are two polar positions as to the proper scope of issue preclusion in antitrust cases (with the parties apparently, and perhaps predictably, situated at the furthest reaches of each). At one extreme, collateral estoppel could be permitted as to all but ultimate facts. This is clearly unacceptable. Evidentiary and mediate findings, although never reaching the level of absolute foreclosure because they can never be per se dispositive, may nevertheless so undermine the factual and legal foundations of an opponent's case that he is left without any means of proving his contentions. At the other extreme, because the foreclo-

276 F.2d 182, 187–88 (10th Cir. 1960); Capps v. Whitson, 157 Va. 46, 160 S.E. 71 (1931).

67. See generally 1B Moore, supra note 2, ¶ 0.442[2].

68. 141 F.2d 927 (2d Cir. 1944), cert. denied, 323 U.S. 720, 65 S.Ct. 49, 89 L.Ed. 579 (1944).

69. Id. at 928.

sure of any issue creates some limitations on the evidence available to support the estopped party's contentions, it is possible that no collateral estoppel whatsoever should be permitted in antitrust cases. This position is equally unacceptable, for it fails to give proper weight to the important policies underlying the principles of res judicata.[70]

A rational middle ground is suggested by the Ninth Circuit Court of Appeals in A. & E. Plastik Pak Co. v. Monsanto Co.:[71]

> "[W]hether a contract is valid under the federal antitrust laws is not an arbitrable issue. . . . Monsanto asserts that [this] issue is not here submitted to arbitration; that following arbitration the contract, as construed by the arbitrators, will be back before the District Court for its determination as to validity under the antitrust laws.
>
> We agree with Monsanto as to three of the issues submitted to arbitration: (1) whether A. & E. had promised not to sell OPS in competition with Monsanto; (2) whether A. & E. had broken that promise; (3) whether Monsanto was justified in repudiating its commitment to purchase OPS from A. & E. These are issues as to which the parties could stipulate without offense to the public interest and as to which they can as well agree upon a method of resolving disputes. To A. & E.'s contention that it will lose its

right to jury trial on these issues the short answer is that it has waived this right by agreeing to arbitration. Antitrust issues in such a case as this, which does not involve alleged conspiracy, are not presented until the facts are known as to what the parties have promised each other or the action to which they are presently bound.

> The same cannot be said of the fourth issue presented for arbitration: the existence and extent of technology within the knowledge of Evans which Monsanto can rightfully claim as privately controlled. This (together with Monsanto's purpose) is the crucial factual antitrust issue, for without such technology as a basis no restriction on competition could be valid as an ancillary restraint. Public interest attaches to the ascertainment of the truth as to this issue. Such issues the parties cannot, by stipulation or otherwise, exclude from the area of judicial scrutiny and determination.

> \* \* \* \* \* \*

> The court understandably could wish to know the precise dimensions of the parties' agreement before undertaking to decide its validity."[72]

In this suit Overseas is acting as a private attorney-general, litigating issues in which there is a public as well as a private interest.[73] As with any other litigant, the public is entitled to a "full and fair day in court". Because the public interest was neither repre-

---

**70.** The doctrine of res judicata "rests upon considerations of economy of judicial time and public policy favoring the establishment of certainty in legal relations". Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948).
"The doctrine is but a manifestation of the recognition that endless litigation leads to chaos; that certainty in legal relations must be maintained; that after a party has had his day in court, justice, expediency, and the preservation of the public tranquility requires that the matter be at an end." Schroeder v. 171.74 Acres of Land, 318 F.2d 311, 314 (8th Cir. 1963). The doctrine "is no mere technicality" [Tillman v. National City Bank of New York,

118 F.2d 631, 634 (2d Cir. 1941), cert. denied, 314 U.S. 650, 62 S.Ct. 96, 86 L.Ed. 521] but rather "a principle of universal jurisprudence". St. Louis Typographical Union No. 8 v. Herald Co., 402 F.2d 553, 555 (8th Cir. 1968).
This conclusion is not inconsistent with exclusive federal court jurisdiction over antitrust cases.

**71.** 396 F.2d 710 (9th Cir. 1968).

**72.** *Id.* at 715–16.

**73.** *See, e. g.*, American Safety Equipment Co. v. J. P. Maguire & Co., 391 F.2d 821, 826 (2d Cir. 1968).

sented nor considered in the arbitration proceedings, which resolved a purely private dispute, plaintiff may now be afforded an opportunity to relitigate certain previously decided issues. Those issues to whose determination a public interest attaches may be termed "antitrust issues", and as to them there can be no collateral estoppel.[74]

It does not follow, however, that anything which affects this case, however remotely, is thereby transmuted into an antitrust issue and open to rede-

termination. The range of foreclosable issues need only be narrowed sufficiently to assure plaintiff here a reasonable opportunity to vindicate the public interest in enforcement of the antitrust laws. To go any further toward relieving plaintiff of the burden of the arbitration award would be to confer on it an undeserved benefit, unnecessary to protect the public's antitrust interests, and in direct contravention of the public interest in the finality of judgments which underlies the doctrine of collateral estoppel.

---

74. "Although, on the whole, the doctrines of res judicata and collateral estoppel are strictly applied, they have been occasionally rejected or qualified in cases in which an inflexible application would have violated an overriding public policy . . . ." 1B Moore, *supra* note 2, ¶ 0.405[11] at 783 (footnote omitted).

Areas of federal pre-emption such as the antitrust laws are a prime example. Claim preclusion is no problem in such cases for no other tribunal would have jurisdiction to enter a valid judgment on a pre-empted cause of action. *See, e. g.,* Kalb v. Feuerstein, 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940). Issue preclusion, however, would normally be unaffected by the fact that the second cause of action was not within the first court's jurisdiction as long as the issues resolved were properly before it. But this brings the policy of finality into conflict with an equally strong policy of pre-emption, which could be effectively, even though not formally, vitiated by strict application of collateral estoppel. *See* Lyons v. Westinghouse Elec. Corp., 222 F.2d 184, 186 (2d Cir. 1955):

"It is true that the estoppel will not, literally speaking, end the jurisdiction of the district court; but it will do so in substance, if it is an estoppel at all, for it will conclude any further consideration of the existence of the conspiracy, and on that all else depends."

The court's task therefore is to effect an appropriate compromise by weighing the conflicting interests and accommodating them according to their relative importance. *But see* Becher v. Contoure Laboratories, Inc., 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752 (1929). The *Becher* case involved the validity of a patent, a matter over which the federal courts have exclusive jurisdiction. There a prior state court decision was raised as a defense, and it was held to be effective as an estoppel even though the effect was to invalidate the patent.

"It is not denied that the jurisdiction of the Courts of the United States is exclusive in the case of suits arising under the patent laws, but it was held below that the suit in the State Court did not arise under those laws. It is plain that that suit had for its cause of action the breach of a contract or wrongful disregard of confidential relations, both matters independent of the patent law . . . . . Oppenheimer's right was independent of and prior to any arising out of the patent law, and it seems a strange suggestion that the assertion of that right can be removed from the cognizance of the tribunals established to protect it by its opponent going into the patent office for a later title. . . .

That decrees validating or invalidating patents belong to the Courts of the United States does not give sacrosanctity to facts that may be conclusive upon the question in issue. A fact is not prevented from being proved in any case in which it is material, by the suggestion that if it is true an important patent is void—and, although there is language here and there that seems to suggest it, we can see no ground for giving less effect to proof of such a fact than to any other. A party may go into a suit estopped as to a vital fact by a covenant. We see no sufficient reason for denying that he may be equally estopped by a judgment. . . ." 279 U.S. at 390–92, 49 S.Ct. at 357.

In commenting on these passages the Sixth Circuit Court of Appeals in Cream Top Creamery v. Dean Milk Co., 383 F.2d 358, 362–63 (6th Cir. 1967), concluded: "Thus if the first suit is brought in a State Court, this will not mean necessarily that facts there proven can be contested subsequently in a Federal Court action, notwithstanding the exclusive jurisdiction of the Federal Court."

The line between foreclosable and non-foreclosable issues represents a balancing of these interests, and it is in the nature of any balancing test that it relies heavily upon the particular facts of each case. Still, the standard of foreclosability is likely in most cases to closely approximate a standard of *centrality*.

"[T]he grant to the district courts of exclusive jurisdiction over the action for treble damages should be taken to imply an immunity of their decisions from any prejudgment elsewhere; *at least on occasions . . . where the putative estoppel includes the whole nexus of facts that makes up the wrong.*"[75]

Conversely, where the prior decision is not intimately and inextricably bound up with the central issues in the antitrust case, but merely determines matters of fact and law which are incidental to the antitrust claim, the prior adjudication ought to be accorded effect as res judicata.[76]

75. Lyons v. Westinghouse Elec. Corp., 222 F.2d 184, 189 (2d Cir. 1955) (emphasis added).

76. *Id.* at 188. In *Lyons* the plaintiff alleged a conspiracy in violation of the antitrust laws. In a prior contract action between the parties in a state court, the alleged conspiracy had been offered as a defense which was rejected. In an opinion by Judge Learned Hand the court of appeals first determined that "the state court had jurisdiction to pass upon whether the defence, as alleged, was proved" (222 F.2d at 186–88), but it did not find this to be dispositive. "It does not, however, follow that final judgment in the state action when entered will be an estoppel in the case at bar. That would be true, we agree, except for § 15 of Title 15, U.S.C.A., because, although the finding that there was no conspiracy involved questions of law as well as questions of fact, it was nevertheless of a kind that courts treat as estoppels. Thus the inquiry comes down to whether, when Congress gave exclusive jurisdiction to the district court over wrongs committed under the Anti-Trust Acts, it only meant that the 'person who shall be injured' must sue in the district court to recover damages; or whether it also meant that the district court must have unfettered power to decide the claim, regardless of the findings of any other courts, even when these were essential to the decision of actions over which their jurisdiction was unquestioned. A priori either reading seems permissible, and the decisions give an uncertain answer. The only case that we have discovered in the Supreme Court is Becher v. Contoure Laboratories, Inc., 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752 . . . . The meat of the opinion is this, 279 U.S. at page 391, 49 S.Ct. at page 375: 'Again, even if the logical conclusion from the establishing of Oppenheimer's claim is that Becher's patent is void, that is not the effect of the judgment. Establishing a fact and giving a specific effect to it by judgment are quite distinct.' That looks as though the distinction were between the finding of one of the constituent facts that together make up a claim and the entire congeries of such facts, taken as a unit; an estoppel is good as to the first but not as to the second. It is possible to read § 71 of the Restatement of Judgments with such a limitation: that is to say if 'matter' be read as all the 'operative' facts that together make up a right." 222 F.2d at 188 (footnotes omitted).

Section 71 of the Restatement provides that: "Where a court has incidentally determined a matter which it would have had no jurisdiction to determine in an action brought directly to determine it, the judgment is not conclusive in a subsequent action brought to determine the matter directly."

The court went on to conclude that there should be no preclusion in that case, "where the putative estoppel includes the whole nexus of facts that makes up the wrong." 222 F.2d at 189.

Although its treatment is less explicit than *Lyons*, *Plastik Pak* (see note 72 and accompanying text, *supra*) seems to be the only other case to have suggested a standard for determining antitrust issues. *Cf.* Premier Elec. Constr. Co. v. Miller-Davis Co., 422 F.2d 1132, 1139 n. 7 (7th Cir. 1970); Engelhardt v. Bell & Howell Co., 327 F.2d 30, 35 (8th Cir. 1964). The other cases dealing with the relationship between arbitration and antitrust proceedings have been limited to what are in fact questions of claim preclusion rather than issue preclusion, though several do suggest that the federal pre-emption of antitrust claims involves a concomitant pre-emption of central antitrust issues. These cases generally hold that while antitrust claims are clearly within the federal courts' exclusive jurisdiction, and one party therefore cannot force the other to submit them to arbitration under a pre-existing arbi-

■ It is worth noting that this standard produces a result which is at odds with the ordinary applications of collateral estoppel. Under this approach issues which are ultimate in the second (antitrust) action can never be foreclosed by estoppel; mediate and evidentiary issues may be, depending on their importance in the case. In the majority of cases, however, estoppel is applied to ultimate issues only. The estoppel is dispositive as a matter of law, and the prospect of imposing non-dispositive findings of fact upon the trier of the fact in the second action is one which courts have faced with some uneasiness. There is even authority for the proposition that collateral estoppel applies exclusively to issues which are ultimate in the second action.[77] Nonetheless, although this point is little discussed in the cases reaching an inconsistent result, there are many instances in which the court has upheld an estoppel as to issues which were not ultimate in the later proceeding.[78] The ultimate issue restriction has, in any event, little support in policy or logic.[79] It is at best a de-

tration clause, other (usually contract) claims arising out of the same transactions are not pre-empted and may be submitted to arbitration, *at least where the underlying issues are reasonably separable*. *See* Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed. 2d 475 (1959) ; Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947) ; Buffler v. Electronic Computer Programming Institute, Inc., 466 F.2d 694, 700 (6th Cir. 1972) ; Helfenbein v. International Industries, Inc., 438 F.2d 1068, 1070 (8th Cir. 1971), cert. denied, 404 U.S. 872, 93 S.Ct. 63, 30 L.Ed.2d 115 ; Associated Milk Dealers, Inc. v. Milk Drivers Union, Local 753, 422 F.2d 546, 552 (7th Cir. 1970) ; American Safety Equipment Corp. v. J. P. Maguire & Co., 391 F.2d 821, 828 (2d Cir. 1968) ; Loevinger, *supra* note 66, at 1094. *See also* Coenan v. R. W. Pressprich & Co., 453 F.2d 1209 (2d Cir. 1972), cert. denied, 406 U.S. 949, 92 S.Ct. 2045, 32 L. Ed.2d 337.

*Plastik Pak* and *Lyons*, however, dealt with situations in which all of the issues were not so neatly divisible. *Compare* A. & E. Plastik Pak Co. v. Monsanto Co., 396 F.2d 710, 716 (9th Cir. 1968), *with* Buffler v. Electronic Computer Programming Institute, Inc., 466 F.2d 694, 700 (6th Cir. 1972). Both cases found that public policy precluded estoppel as to certain common issues; the major difference was the point at which they were identified. Whereas *Lyons* merely determined what effect would be given to a previous decision, *Plastik Pak* conducted that inquiry before the arbitration and held that the arbitrators could not even consider what would in the context of the antitrust case constitute a non-foreclosable "antitrust issue". Such a restriction upon the arbitration is unnecessary to preserve the court's exclusive antitrust jurisdiction, for a refusal to give estoppel effect to any findings touching on antitrust issues adequately protects the public interest in their independent determination. Indeed, assuming that the anti-

trust issues in question are also essential issues in the non-antitrust (and therefore properly arbitrable) claim, such a course would render the arbitrators powerless to decide even those claims as to which their jurisdiction is admitted. This may well be impermissible under the holding of Becher v. Contoure Laboratories, Inc., 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752 (1929), discussed *supra* at note 74.

In any event, given the premise of *Plastik Pak* that non-precludable antitrust issues ought not even to be submitted to arbitration in the first instance, the clear implication of allowing arbitration as to other, incidental issues is that the arbitrator's findings on those issues will be binding in the antitrust case. *See also* Helfenbein v. International Industries, Inc., 438 F.2d 1068, 1070 n. 2 (8th Cir. 1971) ; American Safety Equipment Corp. v. J. P. Maguire & Co.. 391 F.2d 821, 828 (2d Cir. 1968). The resulting test, whether applied before or after the arbitration, appears to be one of centrality.

77. *See* Yates v. United States, 354 U.S. 298, 338, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957) (dictum) ; The Evergreens v. Nunan, 141 F.2d 927, 930–31 (2d Cir. 1944) ; Restatement of Judgments § 68, comment *p* (1942) ; 1B Moore, *supra* note 2, ¶ 0.442[2] at 3858 n. 12.

78. *See, e. g.*, Southern Pacific R.R. v. United States, 168 U.S. 1, 18 S.Ct. 18, 42 L.Ed. 355 (1897) (characterization of certain maps as maps of "definite location").

79. The evil which the Restatement and the court in *Evergreens* sought to avoid by limiting collateral estoppel to facts which are ultimate in the later proceeding was the use of prior determinations to support inferences which were totally unforeseeable at the time of the prior litigation. Laughlin v. United States, 120 U.S.App.D.C. 93, 344 F. 2d 187, 191–92 (1965) ; Hyman v. Regenstein, 258 F.2d 502, 510–11 (5th Cir. 1958),

vice for restricting the doctrine's application to conceptually and administratively easy issues of law, avoiding the difficulties of imposing a partial limitation on the trier of fact. There is no good reason why, in appropriate circumstances, such limitations ought not to be imposed.[80]

### Specific Preclusions

In the course of identifying the forecloseable issues in this case, three categories were established: (1) findings of the court of arbitration that for a variety of reasons other than the public interest in antitrust preemption, were considered inappropriate for estoppel; (2) findings too intimately connected with the central issues of this case to permit an estoppel; and (3) findings to which the doctrine of collateral estoppel can be applied without offense to the public interest.

*Miscellaneous Nonbinding Determinations*—Finding number 3 merely confirms a previous decision of this court. In any event, both 3 and 4 are matters of law as to which there can technically be no estoppel. Numbers 11, 18, 26, 27 and 30 concern rights and liabilities under the contract which are irrelevant to the issues in this case. Several others are adequately covered by other findings. Number 24 is merely a confusing summation of numbers 21, 22 and 34. Number 28 is irrelevant except to the extent it is subsumed under number 29, and numbers 16, 31 and 35 are relevant only insofar as they are included in finding number 12. Numbers 19 and 21 are too imprecise and ambiguous. Finally, numbers 20 and 34 relate to matters not clearly put in issue, at least during plaintiff's case, and thus are not appropriate for presentation to the trier of fact at this stage of the case.

◼ *Issues to Which a Public Interest Attaches*—Findings dealing with orders, production, letters of credit and emission standards tread too near a central issue of plaintiff's case—the "pinching off" of its supply of cars and the reasons for it. Whether the diminished supply was (or at least could be) part of a conspiracy to restrain trade or monopolize is an issue central to the antitrust case. Findings number 9, 10, 14, 22, 32 and 33 all come too close to foreclosing that issue from any serious dispute.

◼ In a similar fashion defendants seek through finding number 13, and to a lesser extent number 14, to exclude the Ro–80 model NSU automobile from the ambit of the importer contract and effectively from this case. Plaintiff relies heavily on ANAU's use of the Ro–80 as a "carrot on a stick", employed as a means of manipulating Overseas and effecting the defendants' conspiracy to restrain trade. It is also an important though undeveloped element of the charge of bad faith dealing under Count III. The trier of fact ought not to be limited by the implications· of finding number 13 that Overseas could have no right or interest in the Ro–80, even though a very narrow construction of it might arguably be acceptable. Finding number 8, stating simply that "ANAU has performed its obligations under the Importer Contract", may be characterized as the ultimate finding of the court of arbitration. It is far too broad and the issue far too important to permit foreclosure.

◼ *Binding Determinations*—The remainder of the proposed findings—

---

cert. denied, 359 U.S. 913, 79 S.Ct. 589, 3 L.Ed.2d 575 (1959). The restriction of estoppel to facts ultimate in the second suit does not provide "a particularly effective or appropriate protection against that danger". 1B Moore, *supra* note 2, ¶ 0.442[2] at 3859. Restriction of estoppel to those issues which were necessary to the prior judgment and whose future use was reasonably foreseeable serves the purpose far better. *See* Hyman

v. Regenstein, *supra*, 258 F.2d at 511. *See also* Note, 52 Colum.L.Rev. 647, 662–63 (1952); Comment, 65 Harv.L.Rev. 818, 842 (1952).

80. The standards noted in note 79, *supra*, of necessity of the prior determination and the foreseeability of its future use are both met in this case. *See* pages 516–517, *supra*.

numbers 1, 2, 5, 6, 7, 12, 15, 17, 23, 25 and 29—help define "what the parties have promised each other or the action to which they are presently bound", without deciding "crucial factual antitrust issues".[81] They are binding upon both court and jury, and may not be controverted.

### Directed Verdict

*Procedure*—After approximately five weeks of trial, it appeared that the plaintiff's remaining proof consisted of some fifteen depositions and several hundred exhibits. Colloquy in chambers at that time developed the certainty that defendants' counsel would present and argue a motion for a directed verdict at the close of plaintiff's proofs. The court then suggested and counsel agreed that the jury should be given a short recess while the court read the remaining depositions and studied the exhibits not yet offered by plaintiff. Counsel agreed to an arrangement by which these materials could be considered along with the evidence already presented to the jury in determining defendants' motion. It should be noted that while counsel for defendants agreed to the procedure, they did not necessarily agree to the ultimate admissibility of either the deposition testimony or the exhibits. Equally important, while the court notified counsel for the defendants that for the purpose of the motion it would consider all of the testimony offered by the plaintiff, including testimony concerning settlement discussions (a portion of which had been excluded by the court during trial), it did so without prejudice to the defendants' right to continue their objections to any evidence they considered inadmissible in the event the motion for directed verdict was denied.

*Standards for Directing a Verdict* [82]—A directed verdict is appropriate where there is a complete absence of proof on an essential element of a party's cause of action or defense,[83] or where the proofs adduced in support of that element are so insignificant as to be the equivalent of no proof.[84] The precise level of non-persuasion required has been variously described, but in essence is reached whenever the facts, and any inferences which may reasonably be drawn from them, point so strongly toward the non-existence of an essential element that no reasonable man could find for its existence.[85]

Of course it is a well-established rule that the court must view the evidence in the light most favorable to the party against whom the motion is made.[86] Thus, no rational inference favoring the plaintiff may be rejected because of conflicting evidence or inferences or questions as to a source's credibility.[87] Even so, once a conclusive deficiency of proof is shown, the court is obligated to direct a verdict. Justice and the integrity of the law itself permit nothing less.

"A directed verdict is a device to save time and trouble involved in lengthy jury determination. It is [also] something more. It is a method for protecting neutral principles of law from powerful forces outside the scope of law—compassion and prejudice." [88]

*The Complaint*—In the catalog of grievances which constitutes Count I of

---

81. *See* text accompanying note 72, *supra.*

82. *See generally* 5A Moore, *supra* note 2, ¶ 50.02[1].

83. *See, e. g.,* Louisville & N.R.R. v. Chatters, 279 U.S. 320, 331–32, 49 S.Ct. 329, 73 L. Ed. 711 (1929); Riddle v. Datko, 448 F.2d 408, 409 (3d Cir. 1971).

84. *See* Boeing Co. v. Shipman, 411 F.2d 365, 372–76 (5th Cir. 1969).

85. *See, e. g.,* Brady v. Southern R.R., 320 U.S. 476, 479–80, 64 S.Ct. 232, 88 L.Ed.

239 (1943); Fortunato v. Ford Motor Co., 464 F.2d 962, 965 (2d Cir. 1972).

86. *See, e. g.,* Teti v. Firestone Tire & Rubber Co., 392 F.2d 294, 297 (6th Cir. 1968).

87. *See, e. g.,* Domany v. Otis Elevator Co., 369 F.2d 604, 608 (6th Cir. 1966), cert. denied, 387 U.S. 942, 87 S.Ct. 2073, 18 L.Ed.2d 1327.

88. Rutherford v. Central Ill. R.R., 278 F.2d 310, 312 (5th Cir. 1960), cert. denied, 364 U.S. 922, 81 S.Ct. 288, 5 L.Ed.2d 261.

the complaint, plaintiff alleges that the defendants conspired to force it out of business as an importer-distributor of NSU automobiles by inducing ANAU to breach its importer contract with plaintiff. In furtherance of the conspiracy ANAU is alleged to have engaged in a "pinching off" of plaintiff's supply of automobiles; refused to market the Ro-80 (a wankel engine car developed by NSU) in the United States, even after plaintiff had been led to believe that it would get the Ro-80 and had expended time and effort in promoting it and aiding in emissions testing; and refused to recognize plaintiff's right under the importer contract to import and distribute Audi automobiles. Based on these actions, defendants are charged with a violation of Sections 1 through 7 of the Sherman Act. Count II alleges a violation of Section 7 of the Clayton Act based on a merger between ANAU and VWAG in July of 1970. Count III is a claim under the Automobile Dealers Day in Court Act for defendants' failure to comply in good faith with the terms of the importer contract.

*The Evidence*—To assist in its review of the evidence, the court asked plaintiff's counsel to summarize in a memorandum the testimony and exhibits which plaintiff contended supported its prima facie case. Careful attention has been given to these materials.

Of course the eleven findings of the court of arbitration form a core of established and uncontrovertable fact. No inference may be drawn which is inconsistent with them. Within these limitations, and viewed in a light most favorable to plaintiff, the evidence permissibly supports the following findings:

1. In the months of January through August, 1969, plaintiff ordered approximately 2,140 cars and received 200. The merger of NSU and Auto Union was completed on August 21, 1969, the date on which plaintiff claims the "pinching off" was begun. In the remainder of 1969 plaintiff ordered 550 cars and received 70. In 1970 approximately 208 cars were received out of a total of 2,065 ordered. In 1971 and 1972 the orders totaled 1,570 and 1,727 respectively; no cars were received.[89] It may therefore

---

89. In its Reply Brief to Briefs of VW, VWOA and ANAU in Opposition to Plaintiff's Motion for New Trial, plaintiff makes the following assertions:

"Plaintiff gave ANAU firm orders for 2740 cars in the year 1969 of which 695 were Ro-80 cars (Exhibit 180, January, 240 cars; Exhibit 181, February, 240 cars; Exhibit 182, March, 250 cars; Exhibit 183, April, 250 cars; Exhibit 184, May, 285 cars; Exhibit 185, June, 285 cars; Exhibit 186, July, 295 cars; Exhibit 187, August, 295 cars and September, 295 cars; Exhibit 188, October, 50 cars and November, 50 cars; Exhibit 189, December, 155 cars). ANAU delivered 270 cars to Overseas in 1969, 200 of which were delivered prior to August 28, 1969; (Merger, August 21, 1969, went into effect) 70 cars were delivered to Overseas during the balance of 1969. (Exhibits 406, 407, 409, 412, 413, 414, 415, 697, 698, 700, 701, 702, 703, 704, 705, 706, 707, 708, 709, 710, 711; also see Exhibits 1062 to 1071).

In the year 1970 Overseas ordered 2065 cars from ANAU and received approximately 208 cars. (Exhibits 398, 399, 400, 401, 722, 724, 725, 712, 713, 714, 715, 716, 717, 718, 719, 720, 721, 727, 728; Exhibits

1062 thru 1071 and Answer to Special Question 10 on Interrogatories to ANAU, invoices furnished).

In 1971 Overseas ordered from ANAU 1570 cars and received none. (Exhibit 1053) No cars were delivered.

In 1972, 1727 cars were ordered from ANAU and no cars were delivered. There has been no delivery of any cars during the years 1971, 1972 and 1973. (Answer to Special Question on Interrogatories to ANAU, invoices furnished)." Plaintiff's Reply Brief, at 11 (punctuation supplied, emphasis omitted).

It is not certain how completely the documentary evidence supports these assertions. The exhibits cited in support of the figures given are not entirely consistent. *See, e. g.,* exhibits 185 and 186, listing Overseas' firm order for the month of July as 285 and 295 respectively. *See also* the widely differing totals compiled by plaintiff in exhibit 191. The exhibits covering the number of cars delivered are of several kinds (invoices, confirmed order forms, "export control documents" listing frame and engine numbers, etc.). They appear in part to overlap, but to what extent is unclear. It should also be noted that many were not offered into evi-

be permissible to conclude that Overseas' supply of cars dried up following the merger. However, because the ratio of cars received to cars ordered increased for more than a year after the merger before dropping off drastically, it cannot be said that the "pinching off" itself actually began or directly coincided with the merger.

It is important to note that plaintiff has not demonstrated that the failure of ANAU to confirm Overseas' orders was unjustified under the contract. Although the court of arbitration determined that ANAU did not breach the contract by its non-deliveries, those findings were not accepted as binding on this court, and the issue remained open, susceptible of proof by plaintiff. It was accepted, however, that the importer contract by itself did not constitute an order for the delivery of specific cars and parts nor did it create an obligation on the part of ANAU to deliver all cars plaintiff ordered.[90] There were qualifications on plaintiff's right to receive cars. There is no evidence from which a jury could reasonably infer that ANAU's failure to deliver any or all of the cars ordered by plaintiff was a violation of the importer contract.[91]

2. Plaintiff has argued at length that the Ro–80 was an "NSU automobile" within the meaning of the importer contract and despite contrary evidence a jury could reasonably so conclude. Both NSU and ANAU presented the Ro–80 as a revolutionary vehicle with tremendous sales potential, particularly in view of its wankel engine. A flood of evidence was offered to show the enthusiasm of NSU, ANAU and Overseas for the Ro–80. Plaintiff exerted its best efforts to promote this and other NSU vehicles and to create a market for them in this country, and assisted NSU in a series of emissions tests designed to qualify its cars (particularly the Ro–80) for importation in the United States. From all of this one might conclude, as plaintiff urges, that it was encouraged to believe that it would be heavily involved in distribution of the Ro–80 in this country. This "carrot on a stick" was held out to plaintiff by both NSU and ANAU throughout their relationship, even after serious problems had developed between Overseas and ANAU. It is admitted that the Ro–80 has never been marketed in the United States. However, there is little evidence to show why this was not done. Plaintiff has on occasion alleged that ANAU sought to license the wankel engine to domestic automakers in preference to importing the Ro–80, but this assertion is totally without support.[92] In some of plaintiff's exhibits there are references to certain serious economic and technical problems.[93] At the very least, however,

dence. The order confirmations actually admitted into evidence indicate that 275 (rather than 270) cars were shipped to Overseas in 1969, and 124 (rather than 208) were shipped in 1970. Nevertheless, except for one arithmetical error the plaintiff's totals have been accepted herein. This is not only to insure that the evidence is in fact viewed in a light most favorable to plaintiff, but also in recognition of the difficulty of extracting *any* clear and unimpeachable answers from this mass of documents. Plaintiff's assertions do appear to be within permissible bounds of inference based on the exhibits cited.

Although not referred to by plaintiff, it may be worth adding that in 1968 plaintiff ordered 327 cars and received 95 (PX 179, 360–62, 681–82).

90. *See* findings of the court of arbitration, numbers 5–7, *supra* at page 507.

91. The court of arbitration found, based on the terms of the importer contract, that ANAU or NSU were obligated to accept plaintiff's orders only "within the scope of the available manufacture". Section 1(1) of the contract "grants to the Importer for the sales territory (§ 3) within the frame of production available the sale of: NSU Automobiles . . . ." Plaintiff at no time attempted to define the nature of this limited obligation or to prove that ANAU's "pinching off" of its supply of cars was impermissible under it. The bare fact that orders were not filled does not prove a violation of this obligation.

92. *See* note 108, *infra.*

93. Plaintiff's exhibit 283, a letter from ANAU to Overseas dated April 15, 1971, states in part:
"As you have no doubt already gathered from your discussions with Mr. Stoll on his

it is certain that a certificate of compliance with emissions standards was required before it could be imported and no such certificate was ever produced.[93a]

In sum, although a jury could reasonably conclude that the Ro–80 was dangled before plaintiff as a "carrot on a stick", there is no evidentiary basis for concluding that the Ro–80 was ever improperly or in bad faith withheld from the United States market. At best plaintiff has shown unbusinesslike enthusiasm on the part of ANAU in vigorously promoting this car without any real assurance that it could deliver the Ro–80 to the United States in even a limited quantity.

3. Plaintiff is bound by the finding of the court of arbitration as well as the plain language of the importer contract to the effect that it was only entitled to NSU automobiles. By negative implication this excludes any right to import and distribute Audi automobiles in this country. Although plaintiff has attempted to prove that the merger of NSU and Auto Union effected a merger of their product lines as well, and thus that plaintiff had a right to sell the Audi, the evidence does not support such a conclusion.[94]

4. There is evidence to the effect that VWAG was the sole owner of Auto

American trip last Fall, as well as from your own experiences, the market for NSU automobiles in the United States i. e. NSU TT, NSU 1000 C and NSU 1200 C has not developed anywhere nearly as well as both you and we had hoped when we made our agreement of July 1, 1968.

To some extent this is the result of American safety and exhaust legislation which has made it increasingly difficult for us, in light of the low sales volume of NSU automobiles in the United States, to supply you at reasonable cost with cars which fully comply with these regulations. As you know, we have been forced to cut our American line back so that it now consists only of the NSU 1200 C. We will produce a 1971 model of this type, at considerable expense to ourselves but we cannot yet give you any firm information on delivery times."

93a. PX 279 purports to be a cover letter for a 1970 Certificate of Conformity on the Ro-80, but the enclosure was never produced (*see* Exhibits tr. at 55).

94. The fundamental error in plaintiff's position is its failure to distinguish between product lines as defined by the nature of the product and product lines as defined by the manufacturer. Overseas was contractually entitled to receive a certain *type* of automobile—"NSU automobiles"—*not* "automobiles manufactured by NSU". Only in the latter instance would its argument have had some merit. Plaintiff's counsel has admitted there are "Audi models" and "NSU models" (tr. 1092). Because it was entitled only to NSU models, whether manufactured by NSU or ANAU, the fact that the merger did create a generic, manufacturer-defined Audi-NSU product line is irrelevant.

Futhermore, the evidence which plaintiff cites in support of these word games it

seeks to play simply does not support the inference that the product lines of NSU and Auto Union were in fact merged. The test is whether the NSU and Audi trademarks continued to be used for distinct kinds of cars. The pictures and advertising materials submitted by plaintiff clearly demonstrate that they were, even though together they were referred to (naturally and accurately enough) as Audi-NSU cars. PX 883, for example, is an advertising brochure which constantly distinguishes between "Audi and NSU cars" and "the two lines", even though it also speaks of them collectively as the "Audi-NSU line". It makes an irresistible comparison to note that because General Motors may advertise (as it does) several of its distinctive products together as GM cars does not entitle a dealer who has contracted for Chevrolets to obtain Oldsmobiles, simply because both are part of the overall GM product line.

Plaintiff also relies on exhibits picturing nameplates bearing the name ANAU which are attached to various parts of NSU automobiles (PX 884–85, 887–89). Plaintiff neglects to note that these plates are required by 49 C. F.R. § 567 (1973), and must contain certain specified information, including the name of the manufacturer. 49 C.F.R. § 567.4(g)(1) (1973).

Finally, plaintiff cites an amended version of the Guaranty Conditions accompanying the importer contract which refers to "Audi-NSU" products and states specifically that "[c]ontract goods shall mean Audi-NSU motor vehicles" (PX 44–45). It is absolutely clear on their faces, however, that the two exhibits are standard forms, intended to cover any dealer handling either or both of the ANAU product lines. The fact that ANAU's guarantee extends to both Audi and NSU vehicles on identical terms, and that these common conditions are expressed under the

Union and after its merger with NSU controlled 59.5 percent of the stock of ANAU.[95] That percentage has since risen to about 99 percent.[96] The president of VWAG is president of the ANAU board of directors, and the present export manager of ANAU previously held important positions in VWAG, VWOA, and Auto Union.[97] As previously noted, VWOA is a wholly owned subsidiary of VWAG, and Import is an independently owned member of the Volkswagen distribution network in this country.

5. A jury might reasonably conclude that following the merger, ANAU intended and actively sought to transfer the distribution of NSU automobiles to the Volkswagen group, either by terminating the contracts of present NSU distributors or by including them within the VW organization (or both).[98]

6. In April of 1971 ANAU informed plaintiff that because the United States market for NSU automobiles had not developed as expected, it intended to abandon it entirely. Accordingly, ANAU notified plaintiff that the importer contract would be terminated effective December 31, 1973, "since it will have lost its substance by then". The letter also offered plaintiff the opportunity to terminate sooner if it so desired.[99] In its reply plaintiff indicated that it did not wish to continue, but pursuant to an earlier suggestion by ANAU it requested inclusion in the VW distribution network as compensation for the termination.[100]

generic heading of "Audi-NSU Guaranty Conditions", in no way lessens the separate identities of the constituent Audi and NSU models being guaranteed; and based on this evidence no contrary inference may rationally be drawn.

95. PX 55.

96. Henn deposition at 14.

97. *Id.* at 8; Sengteller deposition at 4–8.

98. On April 29, 1969, plaintiff was informed by NSU that the merger with Auto Union had been finalized, and was reassured that "the problems in connection with the distribution of the makes NSU and Audi will be clarified in the course of the coming months" (PX 55). On July 15, 1970, ANAU notified plaintiff that it wished to take up negotiations with its importers in the United States "towards finding a viable and fair solution in all cases" (PX 42). The letter also observed that "a solution would have to be found by compensating the NSU importers for the termination of the respective importer contract, to be mutually agreed upon, in the form of including their organisation in the distribution network of the Volkswagen Group or payment of a remuneration for the yielding of import rights to the Volkswagen Group in the United States".

99. The first two paragraphs of that letter are quoted in note 93, *supra*. The letter continues (in part) as follows:
"Unfortunately we find that our difficulties with respect to the American market are compounded by a steadily decreasing demand for NSU automobiles throughout the world. In fairness, we must inform you that it now appears that the production of these automobiles will probably be discontinued sometime during 1973, if not earlier. Therefore, we are terminating our contract as of December 31, 1973 since it will have lost its substance by then.
Because we wish to deliver NSU 1200 C cars to you so long as it is possible for us and desired by you, we do not wish to terminate our contract in accordance with Section 12(1) as of December 31, 1971, or any other date before December 31, 1973. Rather, within the limits of our capacity, we will continue to serve you until December 31, 1973.
Should you, under these circumstances, wish to terminate our agreement before December 31, 1971, or at some other time before December 31, 1973; we shall waive the requirements of Section 12(1) to permit you to do so as of the end of any calendar month, provided only that you give us 3 months' advance notice." ¶¶ 3–5 of PX 283.

100. Plaintiff's reply letter (in part):
"There we come to very serious and difficult question, is it safe and worthy to continue on under past and present experiences and circumstances for both companies. There is even more uncertain and dark future as we se [sic] it, with unpredictable consequences.
We are forced to come with the negative answer. Seriously and urgently recalling your attention and consideration to your letter of July 15, 1970 of compensating NSU importers and to be mutualy [sic] agreed upon in the form of including our

7. Settlement Evidence—ANAU then suggested that plaintiff reapply to Import for a Porsche-Audi retail franchise, which it did. Its earlier application had been shelved, but this application received immediate attention and was eventually approved by Import. Plaintiff had discussed the termination of its relationship with ANAU during the negotiations with Import. Upon the latter's approval, the proposed franchise package was sent to VWOA, accompanied by a letter from plaintiff indicating that it would attempt to "resolve our relationship with [ANAU] along the lines already suggested by us." It appears, however, that plaintiff refused to accept the Porsche-Audi dealership as full consideration for its termination of the importer contract, and VWOA refused to give final approval to the application.[101]

organization in the distribution network of Volkswagen group of a payment of remuneration for terminating of contract." PX 47.

101. The bulk of this "settlement evidence" was excluded at trial and is taken from plaintiff's Offer of Proof as to Import and VWOA. First, regarding the negotiations with Import, plaintiff claims that it was "seeking only a Porshe Audi dealership from Import; that Cal Verduin [of Import] interjected the question of a termination of the importer contract with ANAU, and made certain handwritted [sic] notes, exhibit 1086, which Plaintiff claims supports [sic] that claim". Offer of Proof, at 2. Even if this statement is credited, no conclusions concerning Import's involvement in the alleged conspiracy can be drawn from it. The claimed "interjection" of the "question of a termination of the importer contract" presents a most ambiguous picture of the nature of Import's concern. At least as likely as the inference that Import was acting in concert with ANAU is the inference that Import was concerned with the effect upon Overseas' ability to function as a Porsche-Audi dealer of its status as an NSU importer-distributor. See PX 262, indicating that it was Import's policy to "appoint only exclusive Porsche Audi franchises". It is significant that the language employed in the offer of proof does not allege that Verduin was actually seeking termination, only that he raised the question. A competent businessman would have been negligent not to do so. In any event, the only documentary evidence relating to those discussions indicates that it was Overseas which was worried about termination. In its letter (PX 250) accompanying the application to VWOA, plaintiff stated that it would attempt to resolve its relationship with ANAU "along the lines already suggested by us". The handwritten notes of Cal Verduin referred to in the offer of proof are also very clear that it was Overseas which was taking the initiative on the question of resolving its relationship with ANAU. The notes are headed: "What you [Overseas] want to happen to your NSU Contract!"

(PX 1086). Assuming that Verduin did initially "interject" this question into the negotiations, there is no evidence which would support an inference that Import actively sought termination of the importer contract as quid pro quo for the Porsche-Audi franchise, especially in view of its approval of the application without assurance of termination.

Second, plaintiff claims that the pattern of the defendants' activity regarding the application indicates collusion.

"Involvement [sic] in this conspiracy was John Young, attorney for ANAU who, the proofs will show initiated calls to Overseas, in which Plaintiff asserts, he instructed Overseas to again contact Import regarding the Porsche Audi contract and that Overseas would get a better reception now, since there was some new thinking about it. Although the original application by Overseas had laid dormant for nearly two years and plaintiff had not been able to get any response to numerous phone calls, the proofs will be that they now got instantaneous response. Updated forms were sent out and investigations were made by personnel from Import and Volkswagen of America, with credit checks and floor plan commitments in the sum of $135,000.00 from National Bank of Detroit was [sic] procured as well as a similar one from Livonia National Bank. The Franchise package was being specially handled, as will be shown by Interoffice memos of Import, Exhibits 262 through 268 and especially evidenced by the last paragraph in Exhibit 263. The statement made on behalf of Robert Johnson, secretary and attorney for Import appearing on page 103–4 of Grand Rapids deposition of Hooker et al indicates conversations between him and Mr. Rubin of VWOA in connection with the Franchise Package. The Testimony of Plaintiffs would be that calls were made to Import and to VWOA and to Mr. Rubin (attorney for VWOA) in connection with the delay in acceptance of the Franchise Package which the proofs will show had been approved by Import. The depositions of Mr. Perkins,

■■ *The Necessary Elements of Plaintiff's Cause of Action—Count I—Sherman Act Section 1*—There are two essential elements to any Section 1 offense: (1) a contract, combination or conspiracy, resulting in (2) an unreasonable restraint of trade.[102] The second element may be established by proof that the contract, combination or conspiracy was of a type the law finds to be inherently unreasonable (per se violations), or it may rest upon a showing of anticompetitive motive or effect in the particular case.

■ *Contract, Combination or Conspiracy*—Section 1 of the Sherman Act is not concerned with individual conduct, no matter how anticompetitive. It requires some sort of deliberately coordinated or agreed upon behavior, though this need not take the form of an explicit, formalized agreement. It is enough that the plaintiff establish "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." [103]

■ Because such understandings are seldom capable of proof by direct testimony, they may be inferred from the things actually done.[104] The circumstances surrounding a particular course of conduct may justify an inference of collusion even though there is no evidence of the acts by which the conspiracy was formed.[105] There is a limit, however, to the degree of indirection and innuendo which the law will tolerate. Where, as here, the plaintiff's case is based entirely on such circumstantial evidence, the court must be especially vigilant to insure that liberal modes of proof do not become the pretext for unfounded speculation.

■ Establishing conspiracy as a permissible inference, like any empirical inquiry, is merely an exercise in inductive reasoning—inference based upon the cumulation of consistent data. It is true, as plaintiff points out, that the evidence should not be compartmentalized but should be viewed as a whole when making this determination.[106] Certainly each fact is meaningful primarily as part of a pattern, and the total pattern is the most important datum of all. But for the system to be workable the units of cumulation must begin at a less ambitious and more manageable level than

President and John Cook Vice President indicated it was not the usual thing for Mr. Rubin to make special trips to a prospective distributor as he did, in March, 1972. Other matters appearing in the last two mentioned depositions support the position of Overseas that the top brass were taking an unusual interest in processing Overseas' application. It is the claim of the plaintiff that Volkswagen of America, conspiring with Import and and [sic] pursuant to the pattern of coersion [sic], was attempting to force an early termination of the Importer Contract by dangling the Porsche Audi dealership, before plaintiff, like a carrot on a stick."
Offer of Proof, at 2–3.

102. "Every contract, combination . . . ., or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . . ." 15 U.S.C. § 1.

103. American Tobacco Co. v. United States, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). *See also* Poller v. Columbia Broadcasting System, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); United States v. Paramount Pictures, Inc., 334 U.S. 131, 142, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); Interstate Circuit, Inc. v. United States, 306 U.S. 208, 226–227, 59 S.Ct. 467, 83 L.Ed. 610 (1939).

104. Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 612, 34 S.Ct. 951, 58 L.Ed. 1490 (1914).

105. *See* Rutledge v. Electric Hose and Rubber Co., 327 F.Supp. 1267, 1274 (C.D.Cal. 1971):
"It is true that a conspiracy may be proved by other than direct evidence, for seldom are the conspiratorial villains so devoid of cleverness as to broadcast their oral agreements or publicly circulate the written memos which describe their plan."

106. *See* Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); Sanitary Milk Producers v. Bergjans Farm Dairy, Inc., 368 F.2d 679, 691 (8th Cir. 1966); Lessig v. Tidewater Oil Co., 327 F.2d 459, 466 (9th Cir. 1964), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046.

the "totality of the evidence" which plaintiff has so often urged to be the only proper measure of its case. Examination of the cases reveals several dimensions along which the evidence can profitably be analyzed. These may be characterized as motive, opportunity, and consistency of overt acts.

*Motive*—One way of understanding and explaining any given course of conduct is by analyzing the actor's objectives. The Supreme Court's opinion in First Nat'l Bank v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), upholding a summary judgment against the plaintiff, is an excellent example of the application of motive analysis to Section 1 cases. The relevant facts in that case are not unlike those involved here. The petitioner alleged that Cities Service had conspired with other oil companies to boycott his supply of Iranian oil in violation of Section 1 of the Sherman Act. However, he introduced no evidence of any collusion between the respondent and any other companies, but merely offered theories to explain the bare fact of the oil companies' refusal to deal with him.

> "Petitioner is thus forced to take the position that the one fact that he has produced, Cities' failure to make a deal with him for Iranian oil, is sufficiently probative of conspiracy to entitle him to resist summary judgment.

> In support of this position, petitioner relies heavily on Interstate Circuit, Inc. v. United States, 306 U.S. 208 [59 S.Ct. 467, 83 L.Ed. 610] (1939). . . . In *Interstate Circuit* a group of motion picture distributors, at the request of two large first-run exhibitors, simultaneously imposed identical restrictions on subsequent showings of the films they distributed. . . . There was no direct evidence showing that the distributors

agreed with one another to impose the identical restrictions, but it was shown that each distributor knew all the other distributors had been approached with the same proposal and that the imposition of the restrictions would be feasible only if adhered to by all distributors. Finally, it was shown that the identical action taken had the effect of creating the likelihood of increased profits for each distributor. This Court held that on the foregoing facts a tacit agreement to restrain competition between the distributors could properly be inferred. *Interstate Circuit* varies from the case at hand in precisely the same way that *Poller* [v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)] does, namely, in the inferences of motive that can reasonably be drawn from the facts. The reason that the absence of direct evidence of agreement in *Interstate Circuit* was not fatal is that the distributors all had the same motive to enter into a tacit agreement [*i. e.*, increases in royalties without disruption of current market shares]. . . . Here Waldron is unable to point to any benefits to be obtained by Cities from refusing to deal with him and, therefore, the inference of conspiracy sought to be drawn from Cities' 'parallel refusal to deal' does not logically follow." 391 U.S. at 286–87, 88 S.Ct. at 1591.

In the instant case Overseas has been similarly unable to articulate a satisfactory motive for the alleged conspiracy. At one point plaintiff compiled a list of "benefits" which it suggested would be derived by the defendants from ANAU's refusal to deal, but they do not withstand even the most casual scrutiny.

Points 1 through 9 [107] may be summarized in a single proposition: by refus-

---

107. "1. By refusing to deal with Plaintiff the defendants were able to substitute the Audi line of cars for the former NSU cars.

2. By refusing to deal with Plaintiff, defendants were able to freeze out Plaintiff as an Importer and Distributor of Audi-NSU cars in the United States.

ing to deal with Overseas the defendants were able to effectively terminate the importer contract and plaintiff's business as an importer-distributor of NSU automobiles, and thereby free defendants to market and distribute ANAU products through their own outlets (or to withdraw NSU cars from the market altogether). But the conclusion that any of this could constitute a motive for the alleged conspiracy is a non sequitur. ANAU was not obligated to deliver cars to plaintiff even while the contract was in force, and in any event the contract was terminable at will on relatively short notice. No elaborate conspiracy such as plaintiff alleges was necessary to secure termination of the contract or effect a withdrawal of NSU products from the American market. Plaintiff has never had a colorable claim to any distribution rights in the Audi. The defendants were free to make whatever arrangements they wished for its importation and distribution in this country, and whatever rights plaintiff may have had in the NSU product line were irrelevant. The only conceivable motive for forcing plaintiff to abandon its exclusive distributorship would have been a desire to transfer the right to import and distribute NSU cars within its territory to someone else (presumably VWOA and Import). However, in view of the undisputed fact that the NSU product line has been withdrawn from the American market, the right to distribute it has become totally meaningless.

This leaves one further "benefit", which does perhaps raise a more realistic suggestion of motive:

"10. By refusing to deal with Plaintiff, and by disregarding the rights of the Plaintiff under paragraph (4) of the Importer Contract, the defendants were enabled to license the use of the Wankel Motor to automobile manufacturers in the United States."

There are, however, two fatal defects in plaintiff's contention. First, article 3, paragraph 4 of the importer contract explicitly provides that "[t]he right of NSU to grant licenses for the manufacture of contract goods and for the sale, of such contract goods by the manufacturer within the sales territory remains unaffected . . . ." The only "rights" which plaintiff had in any such licensing arrangements were contained in the contractual assurance that "NSU will, however, duly consider the interests of the importer". And if this is not enough to neutralize number 10 as a possible motive, plaintiff's complete lack of support for its assertion clearly is.

3. By refusing to deal with the Plaintiff the defendants were able to utilize their wholly owned subsidiary, VWOA and thru [sic] it their own franchisees-network in the U.S., to channel Audi-NSU cars.

4. By refusing to deal with the Plaintiff and with the other two Importers of NSU cars, the defendants were able to gain control and a monopoly of the dealer and distributor network of all three Importers in the U.S.

5. By refusing to deal with the Plaintiff and the other two importers, the defendants were able to 'freeze-out' the Plaintiff and the other Importers, as importers and distributors of Audi-NSU cars in the United States.

6. By refusing to deal with Plaintiff, the defendants were able to force a termination of the Importer Contract, for practical purposes.

7. By refusing to deal with Plaintiff, the defendants were able to foreclose and terminate any and all rights the Plaintiff had in the sale, distribution and import of the Ro-80 Wankel powered car in the U.S.

8. By refusing to deal with Plaintiff, the defendants were able to foreclose and terminate any and all rights Plaintiff had in relation to the licensing and use of the wankel motor. The Importer Contract had the following clause (Exhibits 32-3, Article 3, par. (4)):
'The right of NSU to grant licenses for the manufacture of contract goods and for the sale of such contract goods by the manufacturer within the sales territory remains unaffected; NSU will, however, duly consider the interests of the importer.'

9. By refusing to deal with Plaintiff, defendants were able to monopolize the sale and distribution of Audi cars in the United States, through their wholly owned subsidiary VWoA and through VWoA's integrated or controled [sic] distributors in the United States." Plaintiff's Reply Brief, *supra* at 9-10.

There is no evidence that defendants sought such a licensing arrangement sufficient to justify the proposed inference,[108] and thus it cannot be considered.

It can only be concluded that, as in *Cities Service*, there is no evidence of a possible motive for the claimed conspiracy. Although this deficiency is not conclusive, it is extremely damaging to plaintiff's case.

*Opportunity*—Opportunity evidence may be arranged along a continuum of persuasiveness, from that which merely prevents a negative inference by demonstrating that communication and thus agreement were physically possible, to evidence of specific contacts and exchanges of information or suggestion which makes agreement in some measure more probable. Much of the evidence plaintiff has offered which it argues is probative of conspiracy is on the opportunity dimension, and most of this is clustered around the bottom ("mere possibility") range of such evidence. The following facts may be so characterized: (1) VWAG owns 99 percent of the stock of ANAU; (2) VWOA is a wholly-owned subsidiary of VWAG; (3) the president of VWAG is the president of the board of control of ANAU; (4) the present export manager of ANAU has at various times worked for both VW's and Auto Union; (5) Import is a member of the VW distribution network. This is in sharp contrast to cases in which exchanges of price information or other production data,[109] meetings between company officials,[110] or specific invitations to engage in illegal activities [111] have been shown.[112] While it must be conceded that the defendants *could* easily have communicated, the bare physical possibility of agreement has no affirmative probative value. A jury must have *some* probability evidence with which to work; if not, the plaintiff has totally failed to meet its burden of proof.[113]

■ *Consistency of Overt Acts*—In nearly all cases in which a combination

---

108. The sum total of plaintiff's evidence on this point was a statement in the deposition of Gunter Henn, member of the legal department of ANAU, regarding PX 279 (*see* note 93a, *supra*) :

"Q. The purpose of getting this certificate of conformity was not for the purpose of exporting to the United States.
A. Surely not.
Q. But for the purpose of—
A. Assisting in our licensing business.
Q. Assisting in getting your licensing?
A. Yes. This letter has been written from the Technical Department."
The matter of licensing was never pursued any further. Without further explication, this ambiguous statement is insufficient to justify the proposed inference.

109. *See, e. g.,* United States v. Container Corp., 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969) ; United States v. American Linseed Oil Co., 262 U.S. 371, 43 S.Ct. 607, 67 L.Ed. 1035 (1923) ; American Column & Lumber Co. v. United States, 257 U.S. 377, 4 S.Ct. 114, 66 L.Ed. 284 (1921) ; Morton Salt Co. v. United States, 235 F.2d 573 (10th Cir. 1956).

110. *See, e. g.,* United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) ; United States v. American Radiator & Standard Sanitary Corp.,

433 F.2d 174 (3d Cir. 1970), cert. denied, 401 U.S. 948, 91 S.Ct. 928, 28 L.Ed.2d 231 ; Esco Corp. v. United States, 340 F.2d 1000 (9th Cir. 1965) ; Pittsburg Plate Glass Co. v. United States, 260 F.2d 397 (4th Cir. 1958), aff'd on other grounds, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959).

111. *See, e. g.,* United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960) ; Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L. Ed. 610 (1939) ; Girardi v. Gates Rubber Co. Sales Div., Inc., 325 F.2d 196 (9th Cir. 1963).

112. *See generally* Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc., 394 U.S. 700, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969) (data dissemination, meetings, and suggestions of exclusionary practices, as well as parallel behavior).

113. *Cf.* Pevely Dairy Co. v. United States, 178 F.2d 363, 370 (8th Cir. 1949), cert. denied, 339 U.S. 942, 70 S.Ct. 794, 94 L.Ed. 1358, *quoting from* Wesson v. United States, 172 F.2d 931, 933 (8th Cir. 1949) :

"Circumstantial evidence, even in a civil case, is not sufficient to establish a conclusion where the circumstances are merely consistent with such conclusion or where they give equal support to inconsistent conclusions."

or conspiracy is established through circumstantial evidence, the alleged conspirators have engaged in conduct which is in some sense congruent, compatible, or harmonious. Standing alone, such parallel behavior is not enough to establish agreement.[114] It will suffice, however, where the surrounding circumstances indicate that the parallelism is consistent with a theory of deliberately concerted activity and inconsistent with the theory that it represents merely a fortuitous convergence of independent decisions.[115] This may be inferred from factors such as the complexity, originality, unanimity, or exacting correspondence of the overt acts,[116] especially when they represent abnormal reactions to market stimulii and are inconsistent with each actor's economic self-interest.[117] Succinctly put, the rule is that conspiracy may be inferred where the surrounding circumstances make it unlikely that the parallelism of action was purely coincidental.[118]

Yet on this critical dimension plaintiff does not even have the usual parallel conduct to rely on. There are few, if any, overt acts by the defendants which give the appearance of possible coordination. Only ANAU was involved in the alleged "pinching off" of plaintiff's supply of cars. Import, and later VWOA, did refuse to grant plaintiff a Porsche-Audi franchise, but at least on the face of it

114. Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 541, 74 S.Ct. 257, 98 L.Ed. 273 (1954); Delaware Valley Marine Supply Co. v. American Tobacco Co., 297 F.2d 199, 203 (3d Cir. 1961), cert. denied, 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962); Milgram v. Loew's, Inc., 192 F.2d 579, 583 (3d Cir. 1951), cert. denied, 343 U.S. 929, 72 S.Ct. 762, 96 L.Ed. 1339 (1952). Note that the discussion here concerns the use of parallel acts as *evidence* of agreement. There is a similar problem concerning whether consciously parallel action can constitute the *substance* of agreement under the Sherman Act, but that is not presently in issue. See *generally* Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv.L. Rev. 655 (1962).

115. "In deciding whether evidence of defendants' conduct can reasonably support an inference of conspiracy, there must be more than mere general similarities; there must be a sameness of conduct under circumstances which logically suggest joint agreement, as distinguished from individual action." Independent Iron Works, Inc. v. United States Steel Corp., 177 F.Supp. 743, 746 (N.D.Cal.1959).

116. The "'extraordinary and unexplained unanimity of action by the distributors'" in *Interstate Circuit* [Ball v. Paramount Pictures, Inc., 169 F.2d 317, 320 (3d Cir. 1948)] is a classic example, but others abound. See, e. g., C-O-Two Fire Equipment Co. v. United States, 197 F.2d 489 (9th Cir. 1952), cert. denied, 344 U.S. 892, 73 S.Ct. 211, 97 L.Ed. 690 (nationwide price uniformity, few competitors, previous illegal licensing agreements containing minimum price provisions, artificial standardization of product, industry-wide raising of prices at a time of surplus, policing of dealers to maintain minimum prices as contained in price lists published and distributed by defendants, identical bids, uniform use of delivered pricing system). See *also* Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc., 394 U.S. 700, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969); FTC v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948); American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942).

117. "This uniformity in policy forms the basis of an inference of joint action. This does not mean, however, that in every case mere consciously parallel business practices are sufficient evidence, in themselves, from which a court may infer concerted action. Here we add that each distributor refuses to license features on a first run to a drive-in even if a higher rental is offered. Each distributor has thus acted in apparent contradiction to its own self-interest. This strengthens considerably the inference of conspiracy, for the conduct of the distributors is, in the absence of a valid explanation, inconsistent with decisions independently arrived at." Milgram v. Loew's, Inc., 192 F.2d 579, 583 (3d Cir. 1951).

118. Compare the more stringent formulation in Ball v. Paramount Pictures, Inc., 169 F. 2d 317, 319 (3d Cir. 1948): "[C]onspiracy may be inferred when the concert of action 'could not possibly be sheer coincidence'."

that is hardly evidence of a course of conduct similar to that of ANAU.

Plaintiff also argues that there is evidence which could be conceivably construed as suggesting agreement—that discussed previously under the heading of Settlement Evidence.[119] Certainly the events recited are consistent with a theory of cooperation among the defendants. The difficulty is that they are no less consistent with the possibility of independent action. There would be nothing unusual in ANAU recommending that Overseas again approach Import, for that would be the normal and necessary procedure for anyone in this area wishing to become part of the VW distribution network. The treatment of Overseas as a "special case" is hardly surprising in view of its then-current status as an importer-distributor of NSU products. And the ultimate refusal of VWOA to approve the application is unexceptional in view of plaintiff's unwillingness to sever its connections with ANAU. Even if that were shown to have been the reason for the denial (which it was not), such a condition would be good business policy and would likely be insisted upon by *any* franchiser. It is not necessarily indicative of cooperation with ANAU. Finally, even if these assertions were thought to constitute some evidence of conspiracy, they are inadmissible.

*Admissibility of the Settlement Evidence*—This evidence was excluded at trial on two grounds: (1) it concerned conduct and statements made in negotiations attempting to compromise a disputed claim, and (2) it included statements of alleged co-conspirators offered to prove the existence of the conspiracy without prior independent proof of its existence.

It is undisputed that the negotiations concerning the Porsche-Audi franchise represented an attempt by the parties to resolve certain differences existing between them. It is also undisputed that an offer to settle or compromise a disputed claim, along with direct suggestions or overtures of settlement, will not be received in evidence as an admission of liability on the part of the party making the offer.[120] Just how far this principle extends in practice is, however, subject to disagreement.

There are two distinct rationales for this rule; its ambit will vary according to which prevails.[121] An offer to settle may be excluded on grounds of relevancy. In theory, any admission of fact or liability which is made hypothetically for purposes of "buying peace" rather than as an objective statement of fact is inherently unreliable and irrelevant to the truth-finding process. But as a corollary to this theory, whenever there is an admission by a party which may reasonably be interpreted as having been offered for the truth of its content rather than proposed arguendo, it will be admissible, even if it occurs in the course of settlement discussion. Most American courts seem to have adopted this view, and have regularly admitted a wide variety of these "independent admissions of fact".[122]

A second basis for excluding offers to compromise is the public policy favoring private resolution of disputes over resolution through litigation. This theory produces somewhat different results than the first, for according to this latter view, all acts and statements inciden-

119. *See* note 101 and accompanying text, *supra*.

120. *See generally* McCormick, Evidence § 274 (2d ed. 1972) (hereinafter cited as McCormick) ; 4 Wigmore, Evidence §§ 1061–62 (Chadbourn rev. 1972) (hereinafter cited as Wigmore) ; Annot., 15 A.L.R.3d 13 (1967).

121. *See* E. Morgan, Basic Problems of Evidence, (2d ed. 1961) (hereinafter cited as Morgan) ; McCormick at 663 ; Advisory Committee's Notes, Proposed Fed.R.Evid. 408 at 42.

122. *See* cases cited in Annot., 15 A.L.R.3d 13, 30–33, *passim* (1967) ; 4 Wigmore § 1062. Wigmore endorses this theory. *Id.* § 1061(c).

tal to an offer to compromise must be excluded from evidence. This is true even though they might constitute independent admissions of fact under the former theory, as long as they were a legitimate part of the settlement effort.[123]

Although plaintiff urges strongly the necessity of culling out of the settlement evidence certain independent admissions of fact, this is an invitation which must be declined. This court agrees with the authors of the Proposed Federal Rules of Evidence that the policy rather than the relevancy theory is the better *raison d'etre* for the rule and thus a better guide as to its proper bounds.[124] The exceptions and permutations of the rule required to fit it into the relevancy model have produced predictably erratic and inconsistent results, many of which are at odds with important public interests.[125] Moreover, it is highly questionable whether the relevancy theory accurately reflects the realities of the settlement process. For these reasons the exclusion must extend to all "[e]vidence of conduct or statements made in compromise negotiations",[126] and this encompasses the whole of the settlement evidence.

The one remaining question is whether the allegation that the settlement negotiations and their ultimate failure were an integral part of the conspiracy dictates an exception to the normal rule of exclusion. It is generally recognized that offers in compromise are inadmissible only when offered to demonstrate some element of liability in the case at hand. They may be received for other purposes such as proof of costs, due diligence, explanation for delay, etc.[127] Although there is little authority on the point, it would also seem reasonable to admit such evidence where the settlement negotiations are themselves subjects of the lawsuit—*i.e.*, operative facts.[128]

This case might arguably fall within such an exception were it not for the additional fact that plaintiff has had such a large hand in creating this settlement evidence. There is obviously nothing illegal about collaborating in order to meet the threat of a common lawsuit, and plaintiff's own proofs show that very early in this series of events it wrote to these defendants threatening an antitrust action and suggesting a Porsche-Audi dealership as one step in a possible settlement.[129] This in itself raises a question of relevance, for proof that defendants may have communicated with each other and with plaintiff in an attempt to forestall this suit is not probative of a conspiracy to restrain trade. In addition, permitting proof of such activity could easily mislead a jury into finding a Sherman Act conspiracy based on the defendants' cooperation in defending this suit. The danger that plaintiff might bootstrap itself into a case by its own efforts to extort a settlement of a meritless claim is very real,

123. Proposed Fed.R.Evid. 408.

124. Advisory Committee's Notes, *id.*

125. *See* Annot., 15 A.L.R.3d 13, 18, *passim* (1967). *See also* McCormick at 664 (footnote omitted):
"This generally accepted doctrine of denying the protection of the exclusionary rule to statements of fact has serious drawbacks, however. It tends to discourage freedom of communication in attempting compromise, and, taken with its exceptions, it involves difficulties of application. As a result the trend is to extend the protection to all statements made in compromise negotiations."

126. Proposed Fed.R.Evid. 408.

127. *See id.*; McCormick at 664; 4 Wigmore § 1061(d).

128. The principle is of course not the same as the other exceptions, for here the proof would go to liability. It is analogous, however, in that the liability in question would not be on the claim which was originally in dispute and which was negotiated (*i. e.*, a contract claim), but on the distinct antitrust claim which grew out of it. *See* Fletcher v. Western National Life Ins. Co., 10 Cal.App. 3d 376, 89 Cal.Rptr. 78 (1970) (tort claim for emotional distress in which defendant's offer to settle insurance claim was part of the conduct allegedly causing the distress and was provable as such).

129. PX 169.

and tips the scales in favor of excluding all evidence of the attempted settlement.

■ The settlement evidence is largely testimonial in nature. When this is offered for the purpose of proving the existence of the alleged conspiracy, it presents a distinct but equally pernicious danger of bootstrapping the plaintiff into a conspiracy case through the use of unexamined and uncorroborated hearsay. Thus it is a nearly universal rule of law that in order for the extrajudicial statements of one alleged conspirator to be admitted in evidence against another, the existence of the conspiracy and the defendant's participation in it must be shown by independent evidence.[130] Once the conspiracy is established, each conspirator is

> "treated as if he had authorized each of his co-conspirators to do all things which further the conspiracy. This applies as well to verbal as to non-verbal conduct, to both non-assertive and assertive declarations. Hence evidence of a declaration made by one of the conspirators in furtherance of the conspiracy is admissible against the others as tending to prove the truth of the matter declared".[131]

The problem raised here is whether, assuming there is no other evidence of a conspiracy, the acts and declarations of each defendant *individually considered* may suffice to establish the conspiracy.

> "While the declarations of one alleged co-conspirator are not admissible against another co-conspirator, unless the existence of the conspiracy is established by other evidence, the declarations of each co-conspirator are admissible as against him, and the whole evidence may be considered in determining whether a conspiracy has been established. In other words, when the independent evidence, together with

the acts and declarations of one conspirator, establish the conspiracy, and the independent evidence, together with the acts and declarations of the other conspirator, establish the conspiracy, the declarations of each co-conspirator, made during the pendency of the conspiracy and in furtherance of its object, are admissible against both." Bartlett v. United States, 166 F.2d 920, 925 (10th Cir. 1948) (footnote omitted).

■ Assuming arguendo that the acts and declarations involved in the settlement negotiations would, if considered collectively, support an inference of conspiracy, the necessity of establishing the conspiracy separately and exclusively from each party's own acts and declarations precludes such an inference against any of the defendants. The facts simply do not support such an inference based on any one party's acts and declarations when considered along with the other, independent evidence in the case. The requisite proof of conspiracy therefore becomes a logical impossibility: a prima facie showing of conspiracy is factually possible only if the various party admissions can be connected up, *i. e.*, admitted for use against all of the defendants; however, a precondition to such use is a prima facie showing of conspiracy. The existence of the conspiracy is a fact that must be proved by evidence the competency of which does not depend upon an assumption that the conspiracy exists, and for that reason the settlement evidence is necessarily inadmissible.

*Restraint of Trade*—Agreement is a necessary but not a sufficient condition for a Section 1 violation. Plaintiff must also prove that the agreement was "in restraint of trade or commerce", either by showing it was of a type which the law condemns as per se illegal, or by

130. *See, e. g.*, Schine Chain Theatres, Inc. v. United States, 334 U.S. 110, 117, 68 S.Ct. 974, 92 L.Ed. 1245 (1948) ; Glasser v. United States, 315 U.S. 60, 74, 62 S.Ct. 457, 86 L.Ed. 680 (1942) ; Flintkote Co. v. Lysfjord, 246 F.2d 368, 386 (9th Cir. 1957), cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957). *See generally* Annot., 46 A.L.R.3d 1148 (1972).

131. Morgan, *supra* note 121, at 275.

demonstrating an "unreasonable" anti-competitive effect or motive in the particular case.

*Per Se Violations—Price Fixing—* Plaintiff contends that ANAU, in concert with the other defendants, raised the price of its products to levels which made it impossible for Overseas to resell them at a profit, and that this represents illegal price fixing. Both horizontal price fixing [132] and resale price maintenance [133] (vertical price fixing) are classic per se offenses. Although it is somewhat uncertain which of these plaintiff is alleging,[134] it is certain that neither is revealed in this record.

On the one hand, plaintiff's emphasis on the rapid rise in the prices charged by ANAU and the coercive effect of these increases on Overseas implies a theory of resale price maintenance. It is true that restriction of the dealer's pricing freedom is the essence of the offense [135] and that setting an initial price for a product does inevitably affect his freedom to set a resale price by limiting the range of prices at which a profit can be made. However, this is not the sort of restraint at which the antitrust laws are directed.[136] To the contrary, it is an inherent part of the freely competitive economy which they seek to preserve. It follows that there can be no vertical price fixing absent an attempt to control resale prices through non-market means,[137] which is not alleged in this case.

On the other hand, if plaintiff is primarily concerned with the possible participation of the other defendants in ANAU's pricing decisions, its problem is one of fact rather than law. Assuming arguendo that plaintiff has established some form of collusion among the defendants, there is absolutely no evidence to show that it involved an agreement to fix prices. Plaintiff has proved only that it was quoted sharply higher prices for NSU cars. While it now argues that this must have been part of the conspiracy, such a conclusion would be pure conjecture.

*Group Boycott—*It is undenied that several of the defendants have declined to do business with the plaintiff. Even if these actions represent a group refusal to deal, however, they are not "naked restraints of trade with no purpose except stifling of competition" [138] which properly belong within the group boycott category of per se illegality. It is clearly not a per se offense for a manufacturer to agree with a distributor upon an exclusive franchise, even if this means cutting off another distributor.[139] At best plaintiff has shown that follow-

132. *See, e. g.,* United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942) ; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) ; United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927).

133. *See, e. g.,* United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960) ; Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911).

134. It may be that both types are alleged as occurring in a single operation (quite apart from the horizontal-vertical *membership* of the conspiracy). By controlling ANAU's pricing policies (analogous to a horizontal restraint), the defendants might have also affected Overseas' pricing policies in reselling the cars. The two cases may be separately analyzed, however.

135. *See, e. g.,* Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 213,

71 S.Ct. 259, 95 L.Ed. 219 (1951) ; Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 322–23 (2d Cir. 1969), affirming 283 F.Supp. 876, 882–83 (S.D.N.Y.1968), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L. Ed.2d 777 (1969) ; Pearl Brewing Co. v. Anheuser-Busch, Inc., 339 F.Supp. 945, 954 (S.D.Tex.1972).

136. Knuth v. Erie-Crawford Dairy Coop. Ass'n, 326 F.Supp. 48, 52–53 (W.D.Pa. 1971) ; Fagan v. Sunbeam Lighting Co., 303 F.Supp. 356, 360–61 (S.D.Ill.1969).

137. *See* Bailey's Bakery, Ltd. v. Continental Baking Co., 235 F.Supp. 705, 722 (D.Hawaii 1964).

138. White Motor Co. v. United States, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963).

139. United States v. Arnold, Schwinn & Co. 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967) ; White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963).

**540**

ing the merger of NSU and Auto Union, ANAU agreed with members of the Volkswagen group to transfer the distribution of its products to them, thereby cutting off plaintiff. Although literally a concerted refusal to deal, such an arrangement is uniformly recognized to be impermissible only where it involves an anti-competitive motive or effect.[140] Indeed, an examination of the cases purporting to apply a rule of per se illegality to group boycotts reveals that:

"In all of these cases, the touchstone of *per se* illegality has been the purpose and effect of the arrangement in question. Where exclusionary or coer-

cive conduct has been present, the arrangements have been viewed as 'naked restraints of trade,' and have fallen victim to the *per se* rule. On the other hand, where these elements have been missing, the *per se* rule has not been applied to collective refusals to deal." [141]

This observation indicates that the exclusive dealership is not an isolated exception from the strict per se approach, but that in all cases involving concerted refusals to deal some degree of anticompetitive effect or intent must be shown.[142] There are sound policy reasons favoring such a construction.[143]

140. *See* Ark Dental Supply Co. v. Cavitron Corp., 461 F.2d 1093, 1094 (3d Cir. 1972), affirming 323 F.Supp. 1145, 1148 (E.D.Pa. 1971); Cartrade, Inc. v. Ford Dealers Advertising Ass'n, 446 F.2d 289, 292–93 (9th Cir. 1971); Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 76–80 (9th Cir. 1969); Walker Distrib. Co. v. Lucky Lager Brewing Co., 323 F.2d 1, 7 (9th Cir. 1963); Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283, 286–87 (6th Cir. 1963); Beckman v. Walter Kidde & Co., 316 F.Supp. 1321, 1327–28 (E.D. N.Y.1970); Top-All Varieties, Inc. v. Hallmark Cards, Inc., 301 F.Supp. 703, 704–05 (S.D.N.Y.1969); Potter's Photographic Applications Co. v. Ealing Corp., 292 F.Supp. 92, 104–05 (E.D.N.Y.1968); Instant Delivery Corp. v. City Stores Co., 284 F.Supp. 941, 947 (E.D.Pa.1968).

141. E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Comm., 467 F.2d 178, 187 (5th Cir. 1972), cert. denied, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973). An excellent discussion of these cases is found in *McQuade* at 186–87. *See also* Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 76–8 (9th Cir. 1969).

142. *See* E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Comm., 467 F.2d 178, 187 (5th Cir. 1972), cert. denied, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973). *See also* Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 77–78 (9th Cir. 1969); Ace Beer Distributors Inc. v. Kohn, Inc., 318 F. 2d 283, 286 (6th Cir. 1963) ("A refusal to deal becomes illegal under the Act only when it produces an unreasonable restraint of trade . . ."). Cases such as these and the others cited in note 140, *supra*, are a re-

sponse to the dilemma recognized in P. Areeda, Antitrust Analysis (1967) at 287: "It is often said that the concerted refusal to deal—or its evil-sounding equivalent, 'boycott'—is unlawful per se. But there may be restraints with some boycott characteristics that are not or should not be automatically unlawful. If that be accepted, either the initial proposition must be abandoned or 'boycott' must be so defined as to exclude the possibly permissible situations."

143. "When the element of purpose to coerce the trade policy of third parties or to secure their removal from competition is absent, the policy question raised by agreements under which the parties mutually limit their own freedom to deal with outsiders becomes more difficult, and the courts have appropriately outlined wider limits before declaring such agreements illegal.

There are many 'normal and usual agreements in aid of trade and commerce,' * * * which involve the acceptance by the parties of limitations on their freedom individually to deal with others * * *. Requirements contracts, exclusive dealing contracts and contracts involving exclusive territories all involve limitations on the freedom of one or more of the parties to do business with others * * *.

Because all of these situations involve an agreement between two or more persons under which one or more of them agree not to deal with third persons and for that reason foreclose a part of the market to such third persons, they are all subject to scrutiny under the antitrust laws. But in the ordinary case these do not involve combining for the primary

Applying it here, it appears that the defendants' refusal to deal with plaintiff is more appropriately considered incident to the rule of reason analysis, *infra*.[144]

*The Rule of Reason*—The remainder of plaintiff's late-blooming attempts to fit within the per se rule are without merit.[145] Having failed to prove a per se violation, plaintiff must establish that the defendants intended to or did in fact restrain competition, and that such a restraint of trade was or would have been "unreasonable".[146]

This record contains absolutely no indication (other than the plaintiff's allegations) that the defendants were possessed of a "purpose to coerce the trade policy of third parties or to secure their removal from competition." [147] Proof that a former supplier has agreed to take its business elsewhere cannot, without more, be equated with a desire to control the dealer's operations or put him out of business. Plaintiff has not shown any anticompetitive motive behind defendants' conduct, and this case therefore does not fall within the class of cases that condemns "bad actors" with obviously predatory motives even where there is little evidence of anticompetitive effect.[148]

Yet plaintiff has also failed to introduce any evidence as to the market impact of the alleged conspiracy. That the antitrust laws are designed to protect competition, not individual competitors,[149] is a truism of which

purpose of coercing or excluding; rather they involve combinations of two or more persons to further directly the business of the parties to the agreement, and the effect on third parties and on competition is indirect. The issue in these cases is not the existence or nonexistence of concerted refusal to deal, but rather whether the purpose and effect of the operation of the contract, association, exchange or joint sales agency was such as unreasonably to exclude outsiders from participation in the trade in question. The principle of the group boycott cases—that it is prima facie unreasonable for a dominant group to combine to coerce—is not here applicable." Barber, Refusals to Deal Under the Federal Antitrust Laws, 103 U. of Pa.L.Rev. 847 (1955) at 876–77, quoted in Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 77–78 (9th Cir. 1969).

144. Requiring anticompetitive motive or effect in group boycott cases, although it removes them from the absolutist mainstream of per se analysis, does not necessarily reduce them to simple rule of reason cases. There is apparently no requirement that the requisite motive or effect rise to the level of "unreasonableness". However, since proving the existence of motive or effect is also the first step in proving an unreasonable restraint of trade, the analysis must in the first instance be identical.

145. Plaintiff has mentioned a possible tying arrangement involving the Ro–80 and other NSU cars. Even assuming these might represent distinct product markets, there is no evidence that availability of the Ro–80 was ever tied to the purchase of other models. *See generally* Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); Northern Pacific Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Plaintiff also argued briefly that a since-repealed clause in the importer contract restricting its ability to handle competing makes of automobiles was illegal. This point has not been pursued, and in any event its illegality is not obvious. *See* Susser v. Carvel Corp., 332 F.2d 505 (2d Cir. 1964), cert. dismissed, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965); McElhenney Co. v. Western Auto Supply Co., 269 F.2d 332 (4th Cir. 1959). *Cf.* United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

146. Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

147. Barber, *supra* note 143 at 876.

148. The most notable of these is Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). In that case a large chain store employed its purchasing power as a weapon to obtain agreements from manufacturers and distributors to discriminate against Klor's, Broadway-Hale's competitor. It can best be described as a "shock the conscience" case of clearly predatory behavior.

149. *See* Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The statutory phrase "restraint of trade" was taken from the common law, and the courts have drawn heavily on this same source in its construction.

plaintiff has remained determinedly unaware. Whether foreclosing Overseas from handling certain product lines effected a restraint of trade can be determined only by reference to a relevant market. Without some form of market definition there is no yardstick for measuring the overall impact of the alleged restraint.[150] Here there is a complete absence of market data; indeed, plaintiff has never even identified the market(s) in which it claims trade was restrained.[151] As a result there is no basis upon which a jury could reasonably conclude that the acts in question produced any restraint of trade whatsoever. Since there were no rational grounds for rejecting the hypothesis of no restraint, plaintiff's additional failure to produce evidence of unreasonableness[152] is a merely cumulative deficiency.

■■■ Neither agreement nor restraint of trade may be inferred from the evidence, and plaintiff therefore has no case under Section 1 of the Sherman Act. Insofar as plaintiff may still maintain a claim under Section 2 of the Act, it is wholly without support.[153]

Handler, Twenty-Five Years of Antitrust, 73 Colum.L.Rev. 415, 450 (1973). *See, e. g.,* United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911). At common law an agreement is in restraint of trade "when its performance would limit competition in any business". Restatement of Contracts § 513 (1932). From the very beginning, therefore, it has been the law's purpose to protect the public interest in free competition; injury to the individual entrepreneur's competitive position is of concern only as it is indicative of a concomitant public injury. *See, e. g.,* Lamb Enterprises, Inc. v. Toledo Blade Co., 461 F.2d 506, 517–18 (6th Cir. 1972).

150. "To constitute a Section 1 violation the contract, combination, or conspiracy must be in restraint of trade. Generally speaking, an alleged combination in restraint of trade must be evaluated in terms of its market impact and only those conspiracies which unreasonably restrain competition in a particular market are proscribed." Beckman v. Walter Kidde & Co., 316 F.Supp. 1321, 1327 (E.D.N.Y.1970).
*See, e. g.,* United States v. Columbia Steel Co., 334 U.S. 495, 519–20, 527–29, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948); Becker v. Safelite Glass Corp., 244 F.Supp. 625, 640 (D.Kan.1965).

151. The barrenness of the record is highlighted by comparing it with the important elements of market definition:
"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. . . . The boundaries of such a submarket may be determined by examining such practical indicia as industry or public

recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S. Ct. 1502, 1523, 8 L.Ed.2d 510 (1962).
The same patterns of production, distribution, and use may be employed in delineating the geographic market. Id. at 336–37, 82 S.Ct. 1502, 8 L.Ed.2d 510. *Compare* United States v. Grinnel Corp., 384 U.S. 563, 570–76, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Admittedly the analysis need not be framed as a formal treatise, replete with the jargon of the economist [*see* United States v. Pabst Brewing Co., 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966); United States v. Von's Grocery Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966)], but there must be some economic perspective from which the impact of the restraint can rationally be determined.

152. "To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts." Board of Trade of Chicago v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 68 L.Ed. 683 (1917). *See* United States v. Topco Associates, Inc., 405 U.S. 596, 607, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

153. The lack of market analysis clearly precludes any finding of monopolization. *See* United States v. E. I. duPont de Nemours & Co., 351 U.S. 377, 394, 76 S.Ct. 994, 100 L. Ed. 1264 (1956). Although this deficiency

**Count II**—Section 7 of the Clayton Act prohibits a corporation engaged in commerce from acquiring the stock or assets of another corporation engaged in commerce where the effect may be substantially to lessen competition or tend to create a monopoly. Plaintiff has largely ignored this part of the complaint, both in its proof and in argument. This has left many holes in its case, not the least of which is its failure to develop a consistent theory of what merger between what parties constituted the alleged violation.[154] Perhaps the clearest deficiency, however, is the complete lack of evidence demonstrating a substantial lessening of competition. Market analysis is especially important under Section 7, which by its terms requires an anticompetitive impact in a "line of commerce" (product market) in a "section of the country" (geographic market).[155] Here there is no evidence of market structure, market shares, barriers to entry, fluidity and expansion, or any of the multitude of other economic factors from which one might find a lessening of competition, and there is obviously no evidence upon which a finding of a *substantial* lessening of competition could be based.

**Count III**—15 U.S.C. § 1222 authorizes an automobile dealer to sue a manufacturer for his failure to act in good faith in complying with or terminating a franchise agreement. It may be assumed that the importer contract was such a franchise. However, only ANAU and anyone acting for and under the control of ANAU can be held liable for any bad faith conduct relating to its performance or termination.[156] Plaintiff's failure to prove a conspiracy under Count I mirrors its failure to prove such a relationship between ANAU and the other defendants with respect to Count III, and thus only ANAU is potentially liable under Section 1222.

As to ANAU, plaintiff has not demonstrated the necessary lack of good faith. Under the Act "good faith" is narrowly defined:

> "The term 'good faith' shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided*, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith." 15 U.S.C. § 1221(e).

might not be fatal to a charge of conspiracy or attempt to monopolize [*see generally* Note, Attempt to Monopolize Under the Sherman Act: Defendant's Market Power as a Requisite to a Prima Facie Case, 73 Colum.L.Rev. 1451 (1973)], lack of any proof of specific intent clearly is. *See* Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951).

154. Plaintiff has referred to both the NSU–Auto Union merger and the acquisition by VWAG of substantially all of ANAU's stock. The complaint is equally confusing, referring only to "the merger of Audi and VW in July, 1970" which was never explained or established. Complaint ¶ 31.

155. "Determination of the relevant market is a necessary predicate to a finding of a vi-olation of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition 'within the area of effective competition.' Substantiality can be determined only in terms of the market effect." United States v. E. I. duPont de Nemours & Co., 353 U.S. 586, 593, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057 (1957).

156. "The term 'automobile manufacturer' shall mean any person, partnership, corporation, association, or other form of business enterprise engaged in the manufacturing or assembling of passenger cars, trucks, or station wagons, including any person, partnership, or corporation which acts for and is under the control of such manufacturer or assembler in connection with the distribution of said automotive vehicles." 15 U.S.C. § 1221(a).

Proof of actual or threatened coercion or intimidation is thus a precondition to recovery.[157]

 Here there is insufficient proof of coercion on which to go to the jury. There is no showing that ANAU ever engaged in conduct which could reasonably be considered a threat—"a wrongful demand which will result in sanctions if not complied with." [158] Although there were discussions concerning termination of the importer contract, ANAU at no time expressly threatened to cut off plaintiff's supply of cars unless it voluntarily abandoned the contract. Plaintiff may well have viewed the "pinching off" as coercive in nature, but that is not the test.

> "Counsel . . . argue that a subjective meaning should be given to the term 'coercion.' The effect of this would be that any act tending to frighten or upset any given dealer must be presumed coercive. However, in our view this term implies a more objective criterion."[159]

The conduct must be such as would threaten a reasonable man in the dealer's position. Here there is absolutely no evidence which would link the "pinching off" to ANAU's desire to terminate the contract in the mind of the average man. This is especially true in view of the ease with which the contract could by its own terms have been legally terminated by ANAU. Any number of alternative explanations may be made of the sudden decline in the number of cars received by plaintiff, with no basis in the evidence for choosing rationally between them. Therefore the proof under Count III is also deficient.

### Conclusion

The overwhelming reality which emerges from the many weeks of testimony and the hundreds of exhibits in this case is the total failure of the plaintiff to even address many of the central questions raised by the law it has invoked, and its complete lack of concrete evidence as to those elements with which it has concerned itself. As to Counts I and II, plaintiff has fundamentally misconceived the nature of its cause of action.

> "The attempt is frequently made, with respect to the cases involving termination of dealerships, to employ the antitrust acts as a policing measure. Most, if not all, of the cases involving such terminations contain, indeed are based upon, allegations such as we have before us. Usually the acts are such as to conceivably come within the ambit of state laws relating to what we may term generically unfair competition (lack of proper notice of termination, pirating of employees, taking over favored accounts, and similar activities). But the antitrust acts do not purport to formulate a code of business morality. They are not tablets of stone for the conduct of business generally. They are directed at one aspect of business life and one only: the preservation of free competition." B & B Oil & Chemical Co. v. Franklin Oil Corp., 293 F.Supp. 1313, 1317 (E.D.Mich.1968).

The antitrust laws are simply not a high-powered version of the laws relating to breach of contract, to be used whenever one is possessed of a particularly passionate grievance growing out of a business relationship. In Count III

157. *See, e. g.*, Lawrence Chrysler Plymouth, Inc. v. Chrysler Corp., 461 F.2d 608, 610 (7th Cir. 1972) ; Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556, 560–63 (2d Cir. 1970) ; Kotula v. Ford Motor Co., 338 F.2d 732, 733–34 (8th Cir. 1964), cert. denied, 380 U.S. 979, 85 S.Ct. 1333, 14 L.Ed.2d 273 (1965) ; H.R.Rep.No.2850, 84th Cong., 2d Sess. (1956), reprinted in U.S.Code Cong. & Admin.News pp. 4596, 4603 (1956).

158. Berry Bros. Buick, Inc. v. General Motors Corp., 257 F.Supp. 542, 546 (E.D.Pa. 1966), aff'd per curiam, 377 F.2d 552 (3d Cir. 1967).

159. General Motors Corp. v. Mac Co., 247 F.Supp. 723, 726 (D.Colo.1965).

plaintiff has stated a claim which more closely approximates the nature of its proofs, but it has failed to translate personal indignation into objective evidence.

In sum, a directed verdict is necessitated by the complete failure of proof on all counts. Plaintiff's motion for a new trial raised no new arguments or evidence and has been treated as a motion for reconsideration of prior rulings. It must also be denied for the reasons stated above.

An appropriate order may be submitted.